The opinion of the court was delivered by
Manning, C. J.
Ella Roth died on September 5,1878, and a few days afterwards her husband presented her will for probate. It is in these words;—
Iberville Aug 22nd 1878
him
I this day make my will in favor of my husband. — I giveAall of my property that the allows me.
ELLA ROTH.
"Witness
Bettie C. Gourrier
Clay Gourrier
The deceased was childless, and her only heir is her mother, who having been cited at the probate, appeared and opposed it, alleging that *316 the paper was not a will, being null and void for want of the requisites and formalities prescribed by law for an olographic testament.
The will was written on a blank page of an old account-book. The yellow fever was prevailing, and Mr. Roth and his wife shared the general apprehensions which the malignity and fatality of its attacks had inspired. They spoke together of making their wills. He went to his desk, and wrote his, his wife being in the same room, and asking him to bring it to her when he was done. Having finished the writing, but not yet having signed it, he took the book to her, and she wrote hers lower down on the same page, evidently copying his, and only substituting the word ‘husband’ for that of ‘wife’. Mr. and Mrs. Clay Gourrier were the guests of the Roths at that time. They were called in and told what had been done. Mr. Roth then signed his will, and Mrs. Roth signed hers, in the presence of the Gourriers, both of whom attested both writings. Mr. Roth carried the book out of the room, and discovered a few minutes afterwards that the word ‘ him’ was omitted. He took the book back to his wife, and called her attention to the omission, when she immediately inserted that word above the line, by an interlineation. It does not appear whether the Gourriers were then present.
This is the account of the manner in which the wills were made, as .narrated by Mr. Roth and the Gourriers, the latter speaking only of those incidents that were personally observed by them. An attempt was made to prove that the writing was a forgery, and some of the witnesses said as much, while others thought that only the word ‘ him ’ was forged. A large number of witnesses were examined, and' we have gone over the whole testimony more than once, and are satisfied that the imputation upon the husband is as unfounded as it is cruel. Nor can we participate in, or approve the observation of .the opponent’s counsel that, “ when a will in favour of the husband is produced, it cannot be wondered that all persons look with doubt at its genuineness and expect unequivocal proof.” This is said, after reciting the testimony of Mrs. Marionneaux, the mother; but, neither as a general proposition, nor a special one, elicited by and founded upon that testimony, when compared with that of the other witnesses, can we wonder at the provision of the will. Mrs. Roth was a young wife, and a young woman of only nineteen years, and being childless, it would have been wonderful if she had desired to give what little she had, and it was not much, to any other than her husband. Neither do we attach any importance to the interlineation, because the first sentence indicates the person whom she is making her universal legatee, and the word interlined is not absolutely essential to the designation of that person, when the will is read as a whole.
These questions are subordinate in importance to that of the mode *317 of proof, which is presented by tlie opponent’s bill of exception to the admission, by the lower court, of original writings and signatures of the deceased, and the testimony of witnesses, sworn as experts, comparing these writings and signatures with the will. The question thus presented for solution is; — can an olographic will be proved in any other manner than by the declarations of two credible persons, who recognise the will as being wholly in the handwriting of the testator, and as being dated and signed by him, and who derive their knowledge of his handwriting from having often seen him write and sign his name ?
The fact that the names of witnesses are appended to the will neither invalidates it, nor deprives it of its olographic form. Andrews’ case, 12 Mart. 714. And the probate of it must be that required for an olographic will.
Reasons db inconvenienti and db absurdo crowd upon us against the propriety and necessity of requiring the knowledge of a testator’s handwriting to be derived exclusively from having often seen him perform the manual act of writing, when his will comes to be proved. An olographic will of a woman can rarely be proved in this way, and the handwriting of very few men is known from having often seen them write. Take an illustration that naturally suggests itself to us. The lawyers practicing in this court become familiar with the handwriting of the Justices from reading their Opinions in manuscript, and could swear to its genuineness with undoubting certainty, but very few of them have often seen either of us write or sign our names. In the probate of the will of either of us (any early need of which may Heaven forefend) those who have the most certain knowledge of our handwriting could not testify to its genuineness, because their knowledge was not acquired by having seen the manual act of writing often done. The absurdity too of requiring a particular mode of proof for the purpose of obtaining certainty is repulsive, when it is apparent that such particular mode is less certain than several others. Knowledge of handwriting is not acquired as readily, or as accurately, by seeing one write, as it is by inspecting what one has written. A long-continued epistolary correspondence with one, or frequent inspection of his books or accounts or other writings through a series of years, affords a more reliable basis for judging of his handwriting than the mere act of seeing him write. The act of looking at one writing is short. A glance, and you turn away. But the act of reading one’s letters, or of inspecting one’s accounts or other writings, is long and protracted. The testimony of handwriting by comparison is also more reliable than that acquired in the way we are treating of, and our law wisely favours that mode in a manner that presents a striking contrast to the suspicious look with which the common law regards it, and not only favours but expressly authorizes its adoption *318 in the aid, or the absence, of other modes, except when one of these latter is essential. Civil Code, art. 2241 new no. 2245. Code Prac. art. 325. Yet, this mode and all others, save the single one of often seeing the manual act of writing, is excluded, for the purpose of probate, by ■the unequivocal language of the Code, thrice repeated, as we shall presently shew, in as many several redactions.
If any liberty of interpretation were permitted, we might disregard ■the letter of the law, and infuse into it a more liberal spirit. But laws touching the making of wills, and their proof, have ever been held rigorously siricii juris. Sir William Blackstone says, a man has not a natural right to make a will, for because he has kept all other people out of the possession of certain property during his life, constitutes no reason why he should be allowed to designate who shall be its exclusive possessor •after his death, but rather the contrary. Certainly, all formalities of wills are universally required to be strictly observed. The difference between the laws of different countries is, that some require more formalities than others. So, the mode of proof is equally obligatory. In ■some of the States, a will of personalty is good with two witnesses, but a will of realty requires three ; and therefore a testamentary disposition of both kinds of property in one paper, having only two witnesses, would be a good will of the one, but would be entirely void as to the other. These rules are arbitrary, and like that of our Code touching •the kind of proof of olographic wills, unreasonable.
The Travaux Préparatoires for the Code of 1825, consisting of additions and amendments to the old Code, proposed by those who had been charged with that work under the resolution of the General Assembly of March 14, 1822, suggested an alteration of the Code of 1808 as to olographic wills. The articles of the Code of 1808 provided that the •olographic testament must be made by the testator himself, without the ■presence of any witness, and should not be valid unless it be entirely ■written, signed, and dated with the testator’s hand, and is subject to no other form. c. vi. s. 2. art. 103. It must be acknowledged and proved 'by the declaration or affirmation of two credible witnesses, who must ■•attest that they recognise the testament as being entirely written, dated, and signed in the testator’s handwriting, as having often seen him write and sign during his lifetime. Ibicl. art. 160.
The amendment proposed to the first article was, that it should be ■necessary to the validity of an olographic testament, not only that it be •written, signed, and dated entirely by the hand of the testator, but that it have besides the signatures of two witnesses, to whom the testator shall declare that the paper, that he offers to them to sign, is his testament.
The reasons given for the alteration were, that the art of counter *319 feiting writings had attained such perfection, that certainty was no longer possible if the only proof of the verity of a testament was proof of the handwriting of the testator. Travaux Préijaratoires, p. 215. The suggestion was not adopted, and the article of the Code of 1808 was simplified and condensed in the form we now have it in art. 1581, new no. 1588.
But there was no suggestion of any alteration whatever in the other article, (Trav. Prép. p. 220) although that proposed to the first related not only to the proof, but to the kind of proof, and it was literally transcribed as art. 1648 of our present Code, new no. 1655. The first article relates to the confection of a will — the second relates to its probate, and requires the knowledge of the handwriting of the testator of the two credible persons who are offered to prove it, to have been acquired by having often seen him write and sign during his lifetime.
This court held such evidence essential in Buc. of Eubanks, 9 Annual, 147, where it was said — -'the appellee contends that the testimony of witnesses, that Mrs. Eubanks had told them the will was entirely written by her, satisfies the law. We think otherwise. Art. 1648 of the Code is express, that the only proof of olographic testaments is the testimony of two witnesses, that they recognise the handwriting as having often seen the testator write and sign during his lifetime. And this has been reiterated in Lucas v. Brooks, 23 Annual, 117 and Fuentes v. Gaines, 25 Annual, 85.
The proof of this will may be epitomised as follows. Mr. and Mrs. Gourrier each saw the testatrix sign the will. It was written entirely, and dated, out of their presence. He never saw her write except on the single occasion when she signed this will, but has seen orders that were written by her, and also her writing in her books. Mrs.. Gourrier is acquainted with her handwriting only from seeing her sign the will. She knows the will was written by Mrs. Roth because she told her it was written by herself. Alice Porter saw the testatrix write, and sign her name, about five or six times, and that is ‘ often ’ — saw her write notes and songs, and a piece of poetry — received letters from her about twice a month for a year — and recognises the will as being dated, signed, and written in the handwriting of Mrs. Roth. Linda Porter saw the testatrix write her name — received letters from her about once a month, for how long is not stated — saw her write a list of articles for purchase, and saw her write her own name, the name of witness, and of some friends, to pass away the time — cannot state the number of times she saw the testatrix sign her name, but saw her do it often, and recognises the will as being written, dated, and signed by her. These last two are the witnesses that testify of the handwriting from personal knowledge, derived from having often seen her write and sign her name.
*320 Some of the letters to Alice Porter were preserved by her and were offered in evidence, as was also the piece of poetry, and a notarial Act signed by Mrs. Roth, the original of which is brought up with the record. Witnesses were sworn as experts, some of whom, on comparison of the signatures and handwritings, testified that they were the same and were written by the same person, while others swore the contrary. All of this testimony of experts and the writings submitted to them, was objected to by the opponent on the ground that such mode of proof is not permissible for the probate of an olographic will, but only the testimony of persons who derive their knowledge of the handwriting of the testatrix from having often seen her write and sign her name.
We think the testimony was admissible, as supplementing the proof already adduced of two persons who had derived their knowledge of the handwriting in the manner, and from the source, indicated by the Code ; and in rebuttal-of the testimony of the opponent, impugning the authenticity of the will, as being forged. Such testimony cannot by itself prove an olographic will, but when the handwriting has been established in the mode prescribed by the Code, and an Opponent controverts the fact thus established, by an allegation of forgery or other want of authenticity, the declarations of the two witnesses as to the handwriting may be supported by any other mode of proof, but otherwise, it is inadmissible.
The due probate of the will therefore rests primarily upon the testimony of the two Misses Porter, since neither Mr. nor Mrs. Gourriersaw the testatrix sign her name except when slie signed' the will, and never saw her write except on that occasion. The opponent has not raised any question oE the admissibility of the testimony of these witnesses, on such an issue as this, because of their sex. But we are necessitated to consider it.
Women are absolutely incapable oE being witnesses to testaments, says the Code. art. 1584 new no. 1591. Are they also incapable thereby of being witnesses, when a testament is offered for probate, and on the trial of the issue presented by the opposition thereto ?
The laws touching the capacity of witnesses underwent a sweeping alteration in 1867, (Sess. Acts, p. 143) and again in 1868. Sess. Acts, p. 269. The act of this last year was incorporated bodily in the Civil Code in 1870, and was substituted to art. 2260 of that Code, new no. 2281. It enacts that the competent witness of any covenant or fact, whatever it may be, in civil matters, is a person of proper understanding. The same Code contains the prohibition of women being witnesses to a will, and the two articles must be construed together, or if iireconcileable and naturally repugnant, the last must alone stand. They are not irreconcileable.
*321 The act of 1868 removed all those restrictions and prohibitions, touching the capacity of witnesses which formerly prevailed, and which were adhered to with pertinacity and enforced with rigorous precision. It leaped with a single bound to the very front of those speculations with which Mr. Bentham had startled the legal and legislative world: and imitating what had been done in other countries and other of the States, accomplished with one stroke the emancipation of the law of evidence from the thrall which had impeded the ascertainment of truth.
Any person of proper understanding, without regard to age or sex, is made a competent witness, in a civil matter, of any fact whatever it may be. The verity and genuineness of the handwriting of a testator is a fact, and the probate of a will wherein such fact is to be proven, is a civil matter, and therefore a woman of proper understanding is a competent witness thereto and therein.
Judgment affirmed.