*1014
 
 ODOM, Justice.
 

 On May 13, 1933, Mrs. Ada Sutherland, wife of Mike Richards, presented to the court the following instrument, purporting to be the last will and testament of C. E. Sutherland, and prayed that it be admitted to probate, registered, and executed:
 

 “April
 

 “I bequeth to My Sister 20-1930
 

 “Ada Richards.
 

 “All I have.
 

 “C. E. Sutherland.”
 

 On May 16th following the court ordered that letters testamentary issue to Mrs. Richards and that an inventory of the property left by the deceased be made.
 

 On May 24th, Matthew R. and Oliver Sutherland, brothers of the deceased, filed opposition, attacking the will on three grounds, to wit:
 

 (1) That the instrument filed purporting to be the last will and testament of the deceased was not written by his hand.
 

 (2) In the alternative,, that said will is invalid because not properly dated, the month and the year having been omitted.
 

 (3) That the wording of the will is so vague and ambiguous that it could not be construed as a last will and testament.
 

 After trial of the opposition, the court ruled against opponents on all points, and they appealed.
 

 Deceased was a bachelor,and had lived in the house with his sister, Mrs. Ada Sutherland Richards, practically all his life. Mrs. Richards and a niece, who said that she had lived in the house with her aunt and uncle for twenty years, both testified that they had on occasions too numerous to mention seen the deceased write and sign his name and were positive that the instrument presented was wholly written and signed by him.
 

 The deceased had a savings account in the Algiers branch of the Whitney National Bank. Mr. O. E. Drumm, the manager, said deceased had a signature card in the bank and that he had often seen him write his name. He was shown a receipt which he recognized as being in the handwriting of deceased, which receipt was filed in evidence in order that it might be compared with the handwriting of the will.
 

 Deceased was a locomotive engineer and had worked in the yards of certain railroad companies on switch engines for about twenty-five years. C. R Fields testified that he had been general claim agent for one of the roads since 1920; that he had seen deceased write and sign his name on an average of two or three times a year. He had before him while on the stand a report of an accident made out by deceased in October, 1930, shortly after the date of the will. He said he was familiar with deceased’s handwriting and that the instrument purporting to be deceased’s last will was wholly written and signed by him. Miss Deitrieh said she had known deceased thirty-four years, had been employed in the office of Mr. Fields, general claim agent for the Southern Pacific Railroad, for fourteen years, had seen accident reports made out and signed by deceased, had received Christmas cards from him, and was familiar with his handwriting. Shown the instrument purporting to be his last will, she said it was written and signed by him.
 

 
 *1016
 
 Frank H. Mayo, mayor of the village of Harahan, said he had worked in yards of the Southern Pacific Railroad Company as switchman with deceased for twenty-three years, and had often seen him write and sign his name. Edward L. Barnes, interchange clerk in the railroad yards, said he had worked with deceased for twenty-five years, that he had often seen him make out and sign time cards and knew his handwriting. S. Y. Roberts, another switchman in the railroad yards, said he had worked with deceased for two years, said he had seen him write his name almost every day and knew his handwriting when he saw it Mayo and Roberts, on being shown the will, testified that it was written and signed by deceased. Barnes said he was not familiar with his handwriting generally, but was familiar with his signature, and that the will was signed by him.
 

 As against the testimony of the above-named witnesses, we have that of the two brothers of deceased, opponents of the will, and that of an expert, Prof. L. O. Spencer. One of the brothers, Matthew R. Sutherland, testified that the purported will was not in his brother’s handwriting. The other brother was not sure, but he thought it was a forgery. Prof. Spencer was sure it was a forgery.
 

 We have made a most minute and painstaking comparison of the handwriting in the will and the signature attached to it, with documents and instruments admittedly written and signed by the deceased, and are convinced that the handwriting and signatures are the same.
 

 Prof. Spencer said he had made physical examinations of the handwritings presented to him which were admittedly genuine, and had compared them with the document purporting to be the olographic will of deceased, and that he found physical differences. He was asked if he found any “natural variations” between the standards (meaning the genuine writings of deceased) presented to him and the will itself, and he said, “Physical examination shows differences in all writings, in the writing in every line you write, there is some physical difference.” He was asked, “Well, aren’t natural variations the sign of genuine writing?” He said, “It may be.” He was asked, “Well, isn’t it?” and he said, “No; because there are variations in everything. There are variations in every drop of water.”
 

 At one time he said to counsel who was interrogating him, “You write your name twice just as you write it on a check and I will go before a jury and analyze it and show the differences in it, and show that two different people wrote it.” (Test., p. 62). That being true, he, as an expert, could show that any olographic will was a forgery.
 

 AYe are convinced by the testimony as a whole and by our own comparison of the handwritings that the will is genuine. If more be needed, we might consider the human probabilities which force themselves to the front. Mrs. Richards is far past middle life and counsel for opponents while at the bar was asked by a member of the court if she bore a good reputation, and he said she did. It is conceded that if the will was forged she forged it. It is conceivable, but not probable, that she, so late in life, departed from her normal path of rectitude and became a criminal for such srnall gain.
 

 
 *1018
 
 As to the deceased, it was but natural that he should want Mrs. Richards to have his estate. He was a bachelor, had neither father nor mother living, and had lived with her all his life. The natural ties of kinship between them had no doubt been greatly strengthened by their long and constant association together, and then an afflicted brother without means lived with and was being cared for and supported by the two.
 

 As to the date of the will, we think it is certain: The will contains only eleven words and the figures “20-1930,” all written on four lilies. On the top line is the one word “April.” On the next line below are written these words and figures — “I bequeth to My Sister 20-1930.” On the third line are the words “Ada Richards,” and on the fourth line are the words “All I have.” The signature is on the fifth line. So that the instrument presents this appearance:
 

 “April
 

 “I bequeth to My Sister 20-1930
 

 “Ada Richards.
 

 “All I have.
 

 “C. E. Sutherland.”
 

 Counsel for the opponents says in his brief:
 

 “20-1930 might be the day of the month and the year in which the will was written; or it might be the proportion of the testator’s estate that he devised to this particular legatee.”
 

 This suggestion, we think, is unreasonable. It is inconceivable that the testator intended that the figures “20-1930” have any connection with the bequest. If he had so intended, then his will reads as follows: “I bequeth to My Sister 20-1930 Ada Richards all I have.” Thus read, the figures mean nothing at all. But if the figures “20-1930” were intended to be connected with and form part of the date, then the entire instrument would read “April 20-1930. I bequeth to My Sister Ada Richards All I have.” This gives to the figures some meaning. They were inserted for some purpose, of course, and the only reasonable view is that they were intended to form part of the date. The figures connected with the word “April” give the will a date certain and we think that is what was intended.
 

 Many cases are cited by counsel for opponents holding that an instrument purporting to be a last will, which has no date or an uncertain date, is no will at all. We do not here intend to depart from that jurisprudence so well established. (But our holding here is that the instrument before us in this case has a date certain.
 

 Counsel for opponents argues that the instrument on its face does not show that it was intended as a last will and testament, and that it may be construed as a donation inter vivos. We find no merit in this contention. The word “bequeth” (bequeath) is used and that word means, according to Webster’s New International Dictionary (1935), “to give or leave by will, to give by testament, to hand down, to transmit.” The use of the word “bequeath” shows that the instrument was intended as a last will.
 

 The judgment appealed from is affirmed.
 

 FOURNET, J., concurs in the view as to genuineness of the will, but dissents as to its validity.