**56 So.2d 733**

**FELLOWS v. FELLOWS.**

**No. 39557.**

March 19, 1951.

Dissenting Opinion March 28, 1951.

On Rehearing Dec. 10, 1951.

Joseph A. Sims, Hammond, L. Barbee Ponder, Jr., Amite, for defendant-appellant.

P. M. Flanagan, Gerald S. Quinlan, New Orleans, Reid, Burch & Reid, Amite, Columbus Reid, Hammond, for appellee.

HAMITER, Justice.

In contest here is a document purporting to be the olographic last will and testament of Rolland D. Fellows who died in the Parish of Tangipahoa on November 4, 1948.

Decedent was survived by his widow, Mrs. Gladys DeSouge Fellows, but by neither ascendants nor descendants. His estate consisted entirely of an undivided one-half interest in property, acquired by the community previously existing between him and his said wife, which had an appraised value of $178,991.13.

On November 10, 1948, the widow presented to the district court a petition praying for the appointment of a notary public to determine whether decedent had left a last will and testament. The notary was appointed (on the same day), and he was authorized and instructed to search for a will among the effects of decedent, particularly in any bank box standing in the latter's name or in that of the widow.

Five days later, or on November 15, 1948, Wilbur D. Fellows (decedent's brother) filed a petition alleging that the decedent, Rolland D. Fellows, "has left a last will and testament made in the olographic form on the 3rd day of February in the year 1947, which petitioner files herewith in order that same may be admitted to probate." He further alleged "that by the terms of the said last will and testament he was made a legatee and his nephew Don Fellows was made a legatee." On the same date, in accordance with the prayer of such petition, the instrument was probated and its execution ordered according to law.

The purported will written with a pencil, reads as follows:

"Hammond La, Feb. 3, 1947

"This my last will and testament. I revoke all former wills. I bequeath to brother Wilbur D Fellows and my nephew Don Fellows the following property known as the Central Drug Store, Corner of Corner of Cypress & Thomas to Ben Machitta property with Wilbur Fellows holding Controlling interest and management.

Stock and fixtures and 5 000 00 running Expenses

"R D Fellows"

On November 16, 1948, the day following the probate, decedent's widow filed in the succession proceedings a petition in which she alleged that she was given no notice, as required by law, of the intention to probate the purported will and that, therefore, she did not have an opportunity to provide opposition to it when presented. She further alleged that she opposes the instrument's probate, registration and execution on the ground that it is not a valid and genuine will, the handwriting therein not being that of the decedent. She prayed for judgment decreeing the will to be null and void.

On January 17, 1949, after the preparation of an inventory and appraisement of decedent's property and the appointment of an administratrix, Mrs. Gladys DeSouge Fellows (the widow) instituted the instant action against Wilbur D. Fellows and Don Fellows, in the petition of which she prayed that the purported will, together with its probate, be annulled and that she be recognized as the sole heir of decedent entitled, as such, to the possession of all property left by him. Alternatively, in the event the instrument be declared valid, she prayed that she be recognized as the owner of an undivided one-half interest in the community property sought to be donated by the will.

In support of her principal demand herein plaintiff alleged, among other things, that

(1) the purported will was written, dated and signed by someone other than decedent and, therefore, is a forgery and a fraud, and (2) that it is further null and void because of the uncertainty of the provisions thereof.

Don Fellows, decedent's nephew and a legatee under the purported will, filed no answer and otherwise made no defense to the action. Instead, he appeared as a witness for plaintiff during the trial, as hereinafter shown, testifying that the will was not in the handwriting of the decedent. Against Don Fellows a preliminary default was entered.

Wilbur D. Fellows (the other legatee and defendant) answered, denying plaintiff's charges of forgery and uncertainty and averring affirmatively that the will was entirely written, dated and signed by the decedent. He prayed for a trial by jury and, thereafter, for judgment rejecting the demands of plaintiff at her costs.

The district judge refused the request for a jury and ordered the case tried before himself.

After a lengthy trial, resulting in the building of a voluminous record, there was judgment against the defendants, Wilbur D. Fellows and Don Fellows, decreeing the contested will to be null, void and of no effect and recognizing the plaintiff; Mrs Gladys DeSouge Fellows, to be the sole heir of decedent and entitled, as such, to all of the property left by him. The judge con-

cluded, as is shown by his assigned written reasons, that the will was null because it was not only a forgery in its entirety but also its provisions are incapable of enforcement, they not being susceptible of any reasonable interpretation.

From the judgment only defendant Wilbur D. Fellows is appealing.

In their brief filed here counsel for appellant complain first of the district court's refusal to order, as requested, a trial by jury; however, orally they not only did not make that complaint but rather intimated that it had been abandoned. Nevertheless, we are of the opinion that in refusing the jury trial the judge ruled correctly, this being a probate matter which must be decided without the intervention of a jury. Code of Practice Article 1036; Cafiero v. Cafiero, 154 La. 1076, 98 So. 672.

On the merits of the case respecting the issue of fact of whether or not the disputed document is in the handwriting of the decedent the district court reasoned and concluded as follows:

"Don Fellows, one of the beneficiaries named in the purported will, also named as defendant in this suit but who filed no answer thereto, testified at the trial of the case that he lived with the decedent, his uncle, since he was a small boy; that he had worked for his said uncle, R. D. Fellows, since he was old enough to ride a bicycle; that he started working for his uncle as a delivery boy at the Central Drug Store, and

that he was later employed in the drug store as a soda dispenser and clerk; that upon graduating from high school, he had gone to college with the assistance of the deceased and had received his degree in pharmacy; that from the time of receiving his degree in pharmacy until the outbreak of World War II, he again worked at the Central Drug Store, for his uncle, R. D. Fellows; that he spent several years in the United States Army, was honorably discharged with the rank of an officer, and that after his discharge he resumed his position at the same drug store where he has been employed to the present time.

"The appraised value of the property mentioned in the purported will is approximately $56,000.00 and this witness, Don Fellows, was under the impression that, if the will was held valid, he would benefit by the will to the extent of approximately $28,000.00; but, notwithstanding this, he testified that, in his opinion, the purported will was neither written nor signed by his uncle, R. D. Fellows. This witness also testified that, having lived with decedent and worked for him since childhood, he had many occasions to observe the handwriting and signature of his uncle, the deceased, and that he was familiar with his handwriting and signature until the date of his death. This witness, by his conduct and demeanor while on the witness stand, impressed the Court as being perfectly fair, honest and impartial.

"It was brought out during the trial of this case that the decedent at one time during his lifetime had made a will, which was typewritten and signed by the testator in the presence of witnesses and in which will the bequest amounted to practically the same as the bequest of the will in question, but that the deceased, having had a misunderstanding with the wife of Wilbur D. Fellows, and for other reasons, had destroyed the typewritten will.

"There were also several witnesses for the defendant who stated that decedent, at various times during his lifetime, had made statements that he expected to leave the drug store to Wilbur Fellows and Don Fellows. The Court believes that the decedent made such statements and had decided to carry them out by the execution of the typewritten will which he later destroyed. The Court does not remember any witness testifying that R. D. Fellows made any statement after the time he destroyed the typewritten will that he would leave the drug store to Wilbur and Don Fellows. Therefore, the Court is of the opinion that at different times the deceased mentioned the fact that he expected to take care of Don Fellows and Wilbur Fellows, and attempted to do so in the typewritten will, but the Court is also of the opinion that after the decedent destroyed the typewritten will he had no further intention of leaving the property to these two defendants.

"It is hard to believe that a defendant who stood to benefit to the extent of approximately $28,000.00 would testify that, in his opinion, the will was a forgery unless it was actually his opinion. The testimony of Don Fellows, of course, was attacked by counsel for the other defendant, Wilbur D. Fellows, and he was subjected to severe cross examination in which counsel for Wilbur Fellows attempted to show collusion between this witness and the plaintiff. This attempt, in this Court's opinion, was a dismal failure. I do not believe that Don Fellows was ever approached by the plaintiff or promised any reward for giving his testimony. It is true he stated that he was interested in the outcome of the case, but the Court believes he was confused by what counsel meant by an interest in the outcome of the case. This Court believes he meant to express the fact that he, like any other, was interested to know how the Court would decide the case. He would certainly have had more interest in the outcome of the case in obtaining for himself $28,000.00, but I believe he was correct and honest in his conviction that the purported will was not written or signed by the testator.

"The other defendant, Wilbur D. Fellows, testified that the purported will was genuine, giving as his reason for his testimony that he had seen the deceased actually write and sign the said purported will. The circumstances surrounding the writing of the will, according to this witness, were as follows: On the date the will was written, the decedent had passed by his place of business and instructed this witness to bring the books or the big book from the drug store and go out to decedent's farm which is located about two miles east of Hammond; that the deceased then drove to the farm himself; and that he, this witness, got into his own car and also drove to the farm. Upon arrival he found his brother, R. D. Fellows, sitting in his automobile waiting for him; that this witness took the big book and got into the back seat of the car where R. D. Fellows was sitting; that he discussed some business matters with decedent, and after some discussion decedent took a sheet of paper and a pencil and wrote the purported will and gave it to the witness with instructions not to tell their wives anything about the will. This witness did not, however, testify that he was instructed not to mention the will to Don Fellows, his co-beneficiary.

"This witness also testified that, after writing and signing the will, he tore off the end of the paper, reducing the size of the paper to its present dimensions. One can readily see that, at the top of the paper or at the beginning of the purported will, the lines are wider apart and gradually grow closer together toward the bottom of the paper. This leads one to believe that the paper was the same size before the will was written as it is at the present.

"The decedent had a private office at the drug store where his books were located and where he had for many years kept his

books and documents, and it seems unusual that, on this particular occasion, he would request the book to be taken to his farm when he could easily have examined the book in his own private office at the drug store. It is further unreasonable to believe that a man writing a will, especially in the wintertime, would be sitting outside in his automobile when he had so much more convenient facilities inside with chairs, table, gas heaters, etc.

"This defendant, Wilbur D. Fellows, also testified that he had always been close to his brother, the decedent—that they were 'buddies'. This being true, it is also difficult to understand why, after his brother was dead and unable to defend himself, this witness would publicly allege that his brother had withdrawn, or 'knocked down' as he termed it, twenty dollars per day from the proceeds of the drug store in order to deprive the Federal Government of income tax, especially in view of the fact that such allegations and such testimony could have no possible bearing on the validity of the will in question.

*     *     *     *     *     *

"It is true that when this purported will was offered for probate the witnesses testified that they were familiar with the handwriting and signature of the deceased, and that, in their opinion, the will was entirely written, dated and signed by the testator; it is a well known fact, however, that, ordinarily, when wills are offered for probate, the witnesses just casually observe the handwriting and signatures, not claiming to be handwriting experts, and from such casual observation they testify that they believe the handwriting to be genuine, not realizing the possibility of an attack upon the will on the ground that the handwriting and signature are not genuine. The testimony of such witnesses should not be binding against the heirs who were not given opportunity to be present at the time the will was offered for probate.

"Several lay witnesses, including the plaintiff and Don Fellows, testified that they had known the decedent for many years and that they were familiar with his handwriting and signature and that, in their opinion, this purported will was not in the handwriting of the deceased.

"There were three so-called expert witnesses who testified in this case. The first was Mr. George J. Lacey who took the stand on behalf of the plaintiff, the widow of R. D. Fellows. Mr. Lacey qualified himself as an expert and testified at great length, in fact to such length and in such detail that the Court will not attempt to review it in detail. However, suffice it to say that this witness impressed the Court as thoroughly knowing his business, and, in addition, he impressed the Court with his honesty and credibility. His testimony was clear, plain and well illustrated by exhibits. These exhibits consisted of enlarged photographs showing details of the known genuine handwriting of the deceased, and of the handwriting in the questioned

document. He testified frankly and honestly, giving good reasons for his conclusions. This can be easily verified by reading his testimony in connection with his exhibits.

"The next so-called expert was called on behalf of the defendant. He was an old gentleman by the name of Von Aaron, who testified that he was 82 years old; that he resided in Metairie, Louisiana; and that he originally became interested in handwriting as a hobby. This witness did not impress the Court as being as well qualified to give an opinion on handwriting as the witness, Mr. Lacey. From the reading of his testimony, anyone can tell he was not as well qualified as an expert in this line as the witness Lacey.

"The other expert witness, also called on behalf of the defendant, was a Mr. Gullickson who answered questions to qualify himself as an expert and who testified at great length. His testimony, however, was more in the nature of a narrative on the general science of examining questioned documents, including handwriting, and particularly the handwriting constituting the will in question. A close observation of his testimony under cross examination will show contradictions to his testimony given on direct examination.

"In explaining the tremor in the handwriting of the questioned will, this witness, Mr. Gullickson, testified that, in his opinion, the tremor was caused by the shakes, or what is commonly termed 'the morning after the night before,' and that the tremor was due to the fact that the deceased was an alcoholic. However, there was undisputed testimony that the decedent at the time the purported will was dated was not drinking nor had he been for quite a while immediately preceding the date of the will. The physician of the decedent also testified that the decedent was in fairly good shape physically at the time the will was dated and that he suffered from no nervous disorder or alcoholism that would produce a tremor in his handwriting.

"It is the duty of the trial court to arrive at facts in all cases.

"The only way the Court has to arrive at the facts is by hearing the witnesses who take the stand, and in examining exhibits offered. The Court always tries to reconcile the testimony of all witnesses and arrive at the facts from the testimony as a whole. However, when witnesses testify diametrically opposite to each other it is impossible to reconcile all the testimony to arrive at the true facts in the case. Considering the testimony as a whole in this case, and from observing the conduct and demeanor of all the witnesses while on the stand, the Court is of the opinion that the plaintiff has made out her case by a preponderance of the evidence.

"The Court also examined all of the exhibits, including all of the known genuine handwriting of the deceased, and compared it with the handwriting constituting the purported will and can find no similarity between the known genuine handwriting

of the deceased and the handwriting of the questioned document.

"Considering these facts and after comparing the will with the other handwriting, and after considering all of the testimony and exhibits in this case, the Court can arrive at but one conclusion, and that is that the plaintiff has carried the burden of proof by a preponderance of evidence and that judgement should be rendered in favor of the plaintiff, Mrs. Gladys DeSouge Fellows, decreeing the purported last will and testament to be null and void, for the reasons hereinabove expressed."

The foregoing analysis of the evidence appears to us, after our careful study of the record, to be substantially thorough and accurate. Moreover, we are unable to hold that the judge committed manifest error in resolving the considered issue of fact in favor of plaintiff.

Significantly supporting the judge's announced conclusion is the undeniable fact that there exist numerous material dissimilarities in writing characteristics between decedent's known handwriting (various documents admittedly written or signed by him) and the handwriting of the questioned will. These dissimilarities were not only apparent to the experts for both plaintiff and defendant, as they so testified; but also they are even noticable to the naked eye of the layman. In fact, it was primarily on the basis of such discrepancies that the experts formed their respective con-

flicting opinions. Thus, the one appearing for plaintiff testified: " * · * * Now, handwriting is identified just the same as a horse, cow or dog is identified, merely by a sufficient number and combination of similarities upon which to base a reasonable and logical conclusion, and when there is found such a great number of dissimilarities as are found in this particular case that cannot be reasonably explained, and in my opinion they cannot be reasonably explained in this case. there can be but one conclusion and that conclusion being that the two writings were written by different people." In reaching a contrary view the principal expert for appellant theorized: "A fraudulent document is one that is prepared for the purpose of fooling everyone and the purpose is to make it as close to the genuine writing as possible." Then he considered the numerous mentioned inconsistencies in the light of such theory and concluded that, because of them, the disputed document must be genuine.

But we entertain serious doubt that the theory thus employed by appellant's expert is infallible, and can be applied in determining the validity of any questioned document; for it assumes that in the perpetration of a forgery the forger always has before him or is thoroughly familiar with the genuine handwriting of the person sought to be defrauded. There have been forgeries committed, undoubtedly and as appellant's expert concedes, where the forger was without such knowledge or a pat-

tern to follow, and where numerous hand-writing dissimilarities were evident.

Also furnishing support to the trial judge's announced conclusion of fact is the important circumstance (among others) that Don Fellows emphatically repudiated the purported will as not having been written by the decedent, with the handwriting of whom he had been thoroughly familiar for many years. Named as a legatee in that document to receive a bequest of a substantial value, naturally he would have championed the maintenance thereof had he thought it genuine. True, as the district court points out, appellant's counsel questioned the motives of Don Fellows with reference to the repudiation, they suggesting through cross examination that he had made a deal with plaintiff whereby she would leave to him through her last will and testament one-half of her estate. But such a deal is not proved. Also, it would seem unusual, unnatural and very unlikely for a normal person to relinquish an assured benefit (if decedent's will were valid) for a highly uncertain and speculative benefit—a bequest subject to revocation at the testator's pleasure—even though the promised reward be of greater value.

Since we hold that no manifest error appears in the trial judge's finding of fact that the purported will is not in the handwriting of the decedent, it is unnecessary for us to pass upon the legal question of whether such document is null by reason of its alleged uncertainty.

For the reasons assigned the judgment appealed from is affirmed.

FOURNET, C. J., dissents and assigns written reasons.

PONDER, J., recused.

FOURNET, Chief Justice (dissenting).

After hearing the argument in this case and examining during the course thereof the various instruments and documents offered in evidence, I became fully convinced that it was most unlikely Wilbur D. Fellows, brother of the decedent and a man of some 57 years who had entertained an unimpeachable character in the community, would forge the will in question, and now that I have carefully studied the record, I am constrained to disagree with the learned author of the majority opinion that the analysis of the evidence by the trial judge is "substantially correct and accurate," for I find he is inaccurate in his analysis involving some very important facts, and in some instances that he is not supported by the record. Furthermore, I am impressed that the trial judge labored in giving his reasons for judgment, first holding the will was invalid by reason of the fact that it was not susceptible of being carried out, and second that it was invalid because it was a forgery. Consequently, I cannot agree with the conclusion of the majority view that the trial judge did not commit manifest error in resolving the issues of fact in this case in favor of the plaintiff.

The history of the family involved in this litigaton, and the facts and circumstances surrounding the confection and probate of the questioned will are of great importance to an understanding and decision of the case, and, for this reason, I wish to set them out in full as I find them established by the record.

The deceased, Rolland D. Fellows, (known more familiarly as "Roll"), first settled in Hammond, Louisiana, in 1907, at which time he was in his early twenties, probably 22 or 23 years of age. On November 18, 1913, he married a local girl by the name of Gladys Bernice DeSouge, and during the existence of their marriage amassed an estate of considerable size, roughly estimated to be worth approximately $190,000 at the time of his death on November 4, 1948. He left neither ascendants nor descendants.

By 1915 Rolland had acquired a drug store known as the Central Drug Store, and from that year until November 9, 1948, Wilbur D. Fellows, who followed his brother to Hammond in 1915, worked in the drug store, except for the time when he was ill or away at school. During many of these years Wilbur lived in the home of his brother and sister-in-law, Rolland even helping to put him through pharmacy school, as he did his nephew Don later. Rolland, who was quite a heavy drinker, gave up all pretense of running the drug store some 10 years prior to his death and during that time it was managed by his brother, Wilbur,

with his full approval. In fact, it is eminently apparent that during these many years the association between these people was a very close one indeed and that it was only disturbed after the marriage of Wilbur in the fall of 1943 to Eloise Corbin, a woman of considerable means and the member of a prominent local family, when a friction that amounted almost to enmity sprang up between the wives of these two brothers.

In the meanwhile, in 1922, Donald Fellows, the nephew of Wilbur and Rolland, moved to Hammond to live with his uncles, leaving only to attend college and for some 5 years during the first part of the 1940s when he was serving in the armed forces. Although only a schoolboy when he arrived, he too worked in the drug store, first as delivery boy, then behind the soda fountain, and later as pharmacist; finally, from November 9, 1948, the night before Mrs. Fellows opened her husband's succession, being put in full charge of the drug store by his aunt, the plaintiff. It was estimated on the inventory of this succession that the drug store was worth in the neighborhood of $56,000.

In 1943, Rolland, being ill and preparing to enter a hospital in New Orleans, dictated to his brother, who wrote it on the typewriter, his will, which was properly witnessed. In this will he left the drug store to his brother and his nephew, Wilbur and Don Fellows, giving the controlling interest to the brother and also providing for run-

ning expenses of $5,000. This will was subsequently torn up by Rolland, the inference in the record being this was done because of a quarrel between the two sisters-in-law. Although the date on which this was done is not disclosed in the record, the surviving widow testified her husband told her in 1945 he had torn the will up.

The disputed will, which is dated February 3, 1947, contains very much these same provisions and Wilbur Fellows testified that it was written in his presence by his brother Rolland around 9 o'clock on the morning of that day (a Monday) while Rolland was sitting on the front seat of his automobile that was parked on the road in front of the farm owned by him just outside of Hammond, and that Rolland gave the will to him with the admonition that he keep it safely and tell no one about it, particularly not their wives. Wilbur further testified that he marked his own name on an envelope and also the word "personal", sealed it, and placed it in the safe at the drug store, where it remained until the summer of 1948, when the doctor informed him Rolland was slipping fast, at which time he removed the envelope from the safe and took it to his home.

Rolland Fellows died on Thursday, November 4, 1948, and on the following Sunday Wilbur told his attorney he had a paper connected with his brother's death and if he had to secure the services of an attorney in the matter, he wanted him to represent him, but he did not discuss it

further with the attorney at that time because his wife, having been informed of the existence of the will after Rolland's death, objected to anything being done about it until she had had a chance to show it to her cousin, also an attorney, who was not then in town, principally because it was suggested the will might not be good as it had not been witnessed. Efforts were made to locate the cousin, who was finally found in Little Rock, Arkansas, and he asked that the matter be held in abeyance until he could return and have a personal consultation. This consultation took place around 9 o'clock the night of Friday, November 12, and, upon his advice, the will was turned over to Wilbur's attorney the following morning, at which time the plaintiff's attorney immediately was notified, as was also Don Fellows, and a copy of the will given them. From that time the will was never again in the possession of Wilbur Fellows.

In the meanwhile, the surviving widow and her attorney asked Wilbur to continue as manager of the drug store on the night of Tuesday, November 9, and, when he refused because he did not care to commit himself until he was certain of the validity or nonvalidity of the will from a legal standpoint, Don Fellows was put in charge. The next morning, November 10, Mrs. Fellows opened the successsion of her husband, requesting that a search be made for a will, if one existed. The next day was a legal holiday (Armistice) and the cousin of Mrs. Wilbur Fellows returned to Hammond the

day after that, at which time he advised the matter be placed in the hands of the attorneys, as just stated.

The olographic will of February 3, 1947, was probated by the attorneys representing Wilbur Fellows on November 15, 1948, in accordance with the provisions of Article 1655 of the Revised Civil Code setting out the procedure to be followed in such cases, i. e., its acknowledgment and proof by the declaration of two credible persons, "who must attest that they recognize the testament as being entirely written, dated and signed in the testator's handwriting." The authenticity of the will as the olographic devise of Rolland D. Fellows was not only sworn to by Wilbur Fellows by reason of the fact that he saw the decedent writing it in its entirety in his own hand, but also by reason of his familiarity with the handwriting of his brother after many years of close personal business association. In addition, its genuineness was attested by four other witnesses, Earl Spencer, a photographer of Hammond, Cleo McIntrye and Vic G. Anderson, both of whom had worked for the deceased for a number of years, and Robert M. McGee, an attorney and notary public who had had many leases, bills of sales, and contracts signed by the deceased in his presence. (It should be noted here that the two latter witnesses did not appear in court at the request of the defendant for the purpose of attesting to this will, but only happened to be in the office at the time and voluntarily proferred their testimony because of their familiarity with the signature and handwriting of the deceased.)

On January 17, 1949, this suit was instituted by Mrs. Gladys Fellows, the surviving widow, to have the will set aside as a forgery.

While it is true, as observed by the trial judge, that the testimony of the witnesses who attested to the authenticity of the will at its probate was not binding on the plaintiff, who was not present at the time, it must be observed that the jurisprudence of this court is to the effect that the probate of an olographic will by due attestation according to law gives it a prima facie validity and the burden of proving it is not authentic then shifts to those who are opposing it. Succession of McDonogh, 18 La. Ann. 419, 444; Succession of Gaines, 38 La.Ann. 123; Succession of Hagan, 150 La. 934, 91 So. 303; Succession of Wadsworth, 152 La. 131, 92 So. 760. (I think it should be observed here that the plaintiff did have a chance to cross-examine one of these attesting witnesses when he testified on the trial of this case, but her attorneys did not seem interested in testing his familiarity with the decedent's handwriting and signature or in discrediting the testimony he gave at the time the will was probated.)

One of the erroneous statements to be found in the written reasons of the trial judge, adopted by this court with approval, is that "Several lay witnesses, including plaintiff and Don Fellows, testified that they

had known the decedent for many years and that they were familiar with his handwriting and signature and that, in their opinion, this purported will was not in the handwriting of the deceased."

The evidence discloses that the plaintiff and Don Fellows were the only lay witnesses who testified to this effect. Not a single one of the other lay witnesses, either those of the plaintiff or those of the defendant, were even questioned with respect to the authenticity of the handwriting in this will. In fact, they were not even shown the will so far as the record reflects. And this is strange when we remember that two of the plaintiff's lay witnesses were associated with the deceased for many, many years in the Hammond Building and Loan Association, of which the deceased was the president. The lay witnesses of the plaintiff were only placed on the stand to (1) attest the genuineness of the signature of the deceased on certain documents that formed the basis of the testimony of the plaintiff's expert witnesses, and (2) attest to the fact that the deceased on the night of February 3, 1947, some 10 hours after this olographic will was allegedly confected, was not then drinking anything stronger than coffee.

Furthermore, while the testimony of the plaintiff and Don Fellows is to the effect that they were familiar with the handwriting and signature of the deceased and that in their opinion the will was not in his handwriting, they gave not one single fact upon which their opinion in this respect is based. Such evidence has very little, if any, probative value, for it merely reflects the opinion of the witness, with no basis on which the appellate court can gauge the weight to be given it.

On behalf of the defendant, the only witness who testified with respect to the handwriting on this document was Wilbur Fellows and he, as above explained, stated it had been entirely written and signed by his brother Rolland in his presence. The other lay witnesses of the defendant testified primarily with respect to the genuineness of the signature of the decedent and his handwriting on a number of documents that were used for comparison purposes during the course of the trial by the experts of the defendant; to show that the deceased had from time to time expressed his intention of leaving the drug store to his brother and nephew; and that he was an unusually heavy and habitual drinker, and a very sick man, during the latter part of his life. Not a single one of these lay witnesses was ever questioned by the plaintiff on cross-examination, or by the defendant on direct examination, as to the authenticity of the handwriting in the will, not even Vic Anderson, who had attested to its validity when it was probated.

Thus it may be seen that there were only three lay witnesses who testified during the trial of the case on this very important question of the authenticity or forgery of the will, the sole question at issue; the

434

plaintiff and her corroborative witness Don Fellows on the one side and the defendant in his own behalf.

In reaching the conclusion that the will was a forgery, both the trial judge and the majority of this court seem to have been influenced by Don Fellows, with whose testimony they were impressed because he testified the will was a forgery although he stood to benefit thereunder to the extent of $28,000. The trial judge also states that although Don's testimony was vigorously attacked in an attempt to show collusion between him and his aunt, this attempt "was a dismal failure."

In this conclusion I cannot agree, for my appreciation of the evidence is that it clearly shows Don Fellows was discredited on this very important phase of the case by the plaintiff herself. Don Fellows admitted he was personally interested in the outcome of the case, a fact which the trial judge concedes in his opinion. He denied any collusion with his aunt, and stated he knew nothing about her having made a will under which he would inherit her estate equally with the plaintiff's sister. His aunt, the plaintiff here, stated she had drawn up such a will (explaining this was done in the event she predeceased her husband), but tore it up after her husband's death. When she was asked if Don had ever been told of the existence of such a will and knew the contents thereof, she stated she showed him the will the night she tore it up. In addition, she reiterated under pressure that he not only knew of the will and its contents the night it was destroyed, but that he was also fully aware of these facts at the time he denied any such knowledge under cross-examination during the trial. See, pages 204, 205, and 208 of the transcript.

Without casting any further reflection upon either of these people, it might be well to remember that Don not only stands to inherit from his aunt (who is childless and has already indicated her intention of leaving him half of her estate by reason of her execution of the will torn up after her husband's death) if he remains on friendly terms with her, but also that he is at the present time benefiting from this friendship, having been made the manager of the drug store the day before his aunt opened her husband's succession.

The foregoing analysis, in my opinion, clearly demonstrates that the lay witnesses in this case have not furnished evidence that is sufficient to convict the defendant of forging his brother's will, and, in addition, of being a perjurer because he testified the will was in his brother's handwriting and that he had seen him write it. This is particularly true when their testimony is considered in the light of the trial judge's finding of fact that Wilbur Fellows possessed an unimpeachable character in the community prior to the trial of the case and his character was not in any manner assailed or impeached during the trial.

From my examination of the testimony of the experts in the case, I am convinced the trial judge also erred in his conclusion that this testimony preponderates in favor of the plaintiff. In fact, the contrary is true.

At the outset I would like to state that in Louisiana, as well as in the common law states, the testimony of handwriting experts is received and acted upon with great caution, and this is particularly true of handwriting by comparison, even where there are several documents for comparison. Barfield v. Hewlett, 6 Mart, N.S., 78; Temple v. Smith, 7 La.Ann. 562; Succession of · McDonogh, 18 La.Ann. 419; Barlow v. Harrison, 51 La.Ann. 875, 25 So. 378; D'Angelo v. Nicolosi, 197 La. 797, 2 So.2d 216. At most, it is only opinion evidence that · requires corroboration before it is entitled to any particular probative value. Succession of McDonogh, 18 La.Ann. 419; Succession of Roth, 31 La.· 315, 320; Succession of Morvant, 45 La.Ann. 207, 12 So. 349; Succession of Drysdale, 127 La. 890, 54 So.· 138; Succession of White, 132 La. 890, 61 So. 860. As Judge O'Niell said in his concurring opinion in Succession of Wood, 182 La. 960, 162 So. 741, 746. "The opinions and testimony of handwriting experts.is entitled to great respect, but it is not infallible. That is demonstrated by the difference of opinion between the two experts in this case, and by the difference of opinion which we find so often in cases involving the question of genuineness or identity of the handwriting of an individual."

These rules developed in our jurisprudence are based on a very sound and logical foundation, as is demonstrated by a reference to the annotation on this subject at 6 A.L.R. 507 (supplemented at 12 A.L.R. 212 and 27 A.L.R. 319), where it is pointed out that "in order that facts may not mislead, their significance must be understood, and this significance may be appreciated only under the tuition of specialists. Hence the admissibility of expert testimony, the function of the expert being not to resolve an issue for the decision of which the trier of the fact has not the necessary training, but to supply the vicarious experience which will enable the trier to reach a correct conclusion. Such being the function of the expert, it is obvious that the aid which he may afford is a variable quantity, according to the extent of his perception of the various factors entering into the problem, and the correctness of his appreciation of their significance. *In view of the fact that some of these factors,* in the case of handwriting, *must remain to a great extent unknown, such as the condition of the writer's health, or the emotions under the influence of which he may have been at the time, the dubitancy with which the reasoning of handwriting experts is ordinarily followed is justifiable.* No problem can be solved with mathematical certainty where some of its factors must remain imperfect-

ly known. The jury sometimes do right in giving credence to the incredible, and the long arm of coincidence may set the doctrine of probabilities at naught. It is interesting to note that in the Howland Will Case, in which Professor Benjamin Peirce gave the famous testimony, based upon the mathematical law of probabilities, that the probability of two signatures of the same person being exactly alike was so infinitesimal as to be 'practically an impossibility.' * * * Hence there is, and can be, no rule that the conclusion which the data supplied by the expert tend to establish is to be preferred to the conclusion to which other evidence in the case points, or vice versa." (The italics has been added by me.)

This is further emphasized by the testimony of Professor L. C. Spencer, for many decades an acknowledged handwriting expert of renown in New Orleans, in the case of Succession of Sutherland, 181 La. 1011, 160 So. 794, 796, to the effect that "'Physical examination shows differences in all writings, in the writing in every line you write, there is some physical difference. * * * You write your name twice just as you write it on a check and I will go before a jury and analyze it and show the differences in it, and show that two different people wrote it'" causing the court to comment in that case that "That being true, he, as an expert, could show that any olographic will was a forgery." See, also, Barlow v. Harrison, 51 La.Ann. 875, 25 So. 378.

The foregoing jurisprudence and comments are particularly true in the instant case, where the defendant introduced the testimony of two experts while the plaintiff produced only one, and even conceding that one of the defendant's experts was not as qualified as the other two experts (which I concede only for the sake of illustration), then we have two experts with equally impressive backgrounds pitted against each other, calling to mind the court's conclusion in Succession of Loewer, 177 La. 869, 149 So. 504, 505, that "Expert testimony is of no aid to the court where, there being two expert witnesses, they contradict each other, and one appears to be as competent and as worthy of belief as the other." See, also, Succession of White, 132 La. 890, 61 So. 860.

The observation of the trial judge, therefore, that the testimony of the expert for the plaintiffs, George J. Lacy, is entitled to more probative value than that of the equally eminent expert for the defendant, Ira N. Gullickson, was nothing more than his opinion, and I do not think that even this opinion, when carefully considered in connection with the testimony given by all three experts and the facts and circumstances of this case, can withstand the test of careful scrutiny any more than has the remainder of his reasoning, as just above demonstrated.

Mr. Lacy, who preferred to be known officially as an examiner of questioned documents rather than as a handwriting expert,

became interested in the work in this field in 1916. He stated he has learned all he knows on this subject by reading and studying all of the recognized books, by taking two courses of study at Northwestern University, by working in laboratories, and by working with leading experts in this field in the United States. He is a member of the American Society of Questioned Document Examiners, a society composed apparently of some 13 persons who are adherents of what is known as the Osburn school of thought in this field, Osburn the elder having founded this society. Mr. Lacy lives in Houston, Texas, where he at one time held the position of questioned document examiner for the postal department; he has qualified as an expert in this line in some 13 state courts; and he has had questioned documents submitted to him by the FBI, the post office department, the U. S. Secret Service, and the United States Marshal's office, as well as by state departments, large corporations, business firms, attorneys, and various individuals.

Mr. Lacy produced a great many blown-up exhibits of various letters and words lifted at random from the known genuine handwriting of the decedent and from the questioned will, and it is obvious that in certain instances he picked those letters and words that were the most dissimilar instead of those that were the most similar to the disputed handwriting. A striking example of this is his selection of the very perfect and Spencerian type capital "Ds" to be found on plaintiff's Exhibit No. 22, while practically all of the admittedly genuine signatures of the deceased show that the capital "D" in his signature was formed almost in the shape of a tall triangle—thus $\triangle$. He testified at great length from these blown-up exhibits, giving his reasons for concluding the questioned document was spurious. Many of these reasons, in my opinion, are as illogical as some of them are logical.

Mr. Gullickson, the defendant's principal expert, has not been working in this field as long as Mr. Lacy, being a comparatively young man, but his background and his experience is, to my view, much more impressive. He is a member of the International Society for Identification and, at the time he was testifying, the chief document examiner in the Metropolitan Police Headquarters in Washington, D. C. He first began a study of questioned documents in 1927 as a hobby, but has been directly connected with it since 1931. He explained that there were not then and are not now (with the exception of the school at the FBI) any recognized schools where courses are given in handwriting for expert purposes. However, he also attended Northwestern University, where he went through the school of criminology, in which handwriting and questioned document courses are given. In addition, he has taken the course of study prescribed by the FBI, and while there he was taught by the nation's recognized authorities. At the FBI he was

associated with Burt Farrar, who was, for some 40 years prior to his recent retirement, the examiner for the United States Treasury Department, and is recognized as the dean of examiners in the United States. The notes he took during his course at Northwestern, along with those taken by two others taking the course, Appell and Donaldson, formed the background for the establishment of the laboratories of the FBI in Washington.

Mr. Gullickson states that he examines on the average of 900 to 1200 cases a year (a case may consist of only one document or a hundred) and makes over 400 court appearances. He has appeared before all of the courts in the District of Columbia and outlying jurisdictions, and in the state and federal courts of six other states. He has appeared before the investigating committees of both the United States Senate and the House of Representatives. He has been consulted at various times by the labor department, the post office department, the treasury department, the justice department, the commerce department, and the civil service departments of the United States; in the latter department his appearance was in connection with the recent loyalty probes. The work done by him was instrumental in bringing to light the recent forgeries in the export license racket that ran into the millions. He has testified in such famous cases as the Blair Estate case, the Lindberg kidnapping case, the court martial of the chauffeur of Admiral Mc-Intyre (this at the request of the White House), the General Schiniskey death probe, and the Means fraud, the latter being at the request of the late Evelyn Walsh McLean. He felt he was especially qualified to testify in the field of abnormal writings, where the writing is done under the influence of alcohol, drugs, dope, and the like, for the reasons that hundreds of the cases he handles involve such forgeries.

Mr. Gullickson did not produce any impressive blown-up exhibits, stating that all of his opinions are based on the original documents and that the enlargements are merely to illustrate and aid the court and prove nothing in themselves. He did, however, make photostatic comparisons of the genuine handwriting of the deceased on the exhibits furnished him by the defendant, the plaintiff's exhibits not being available to him until the trial; and he also testified at length in giving the reasons why he thought the will was undoubtedly in the handwriting of Rolland D. Fellows, showing in detail that none of the elements that constitute forgery are to be found in the will. His conclusion was that any dissimilarities to be found in the handwriting on the will that could not be explained by the natural variation that exists in the handwritings of all individuals, could easily be explained by reason of the fact that the will was, to his mind, clearly the work of "an individual that we term as one who has the shakes the morning after the night before," a condition that would not exist later

on in the day or the next day, at which time a much different picture would be presented.

His testimony in this respect is corroborated by that of the defendant's second expert, S. F. Von Aaron, a venerable man of some 82 years of age who lives in New Orleans, is employed regularly as the art director of Walen Company, and has studied and worked in the handwriting field for some 40 years, principally because it is his hobby. He stated that he has testified in the court on the average of twice a year for the past 20 years, having qualified as an expert in this field in a number of states. It was his opinion that the questioned will was definitely written in its entirety by the deceased, his conclusion in this respect being that "This whole document seems to be written under stress, written at a time when a man was not himself, written under strain."

Even the expert for the plaintiff admitted the dissimilarities he pointed out as existing in the questioned will would not render it spurious if they could be reasonably explained, as is evidenced from the quotation of his testimony incorporated in the majority opinion, but he chose to believe there was no logical or reasonable explanation for these dissimilarities in this case.

I think there is an eminently logical and reasonable explanation for whatever discrepancies may appear in the handwriting on the will. It was proved that the deceased was a heavy and an habitual drinker (the testimony is that he drank so heavily along about the time the will was written that the liquor was then being taken to him in "case lots"). It was also proved that following one of these heavy drinking bouts he did not write in his normal way, as is eloquently demonstrated by some of his admittedly genuine signatures, particularly those to be found on pages 48, 53, 54, 55, 58, 59, and 62 of the official minute book of the Hammond Building and Loan Association introduced as an exhibit, as well as that on the lease that is plaintiff's Exhibit No. 14 and in the pencil signatures to be found in the United States Internal Revenue narcotic permit book that is plaintiff's Exhibit Nos. 16 and 17. (The will is written in pencil.)

In addition, the will was written by the decedent, according to Wilbur Fellows, who was present at the time, while sitting on the front seat of an automobile, a Saturday Evening Post or some such magazine being used as a backer.

If any further corroboration is needed, I think all of the circumstances surrounding the case are in favor of the defendant. Rolland D. Fellows was childless and Wilbur and Don were his closest relatives. He had more or less raised them, putting both through school. The record shows he was extremely close to his brother, and the two named in the will had both labored with the decedent many years in making the drug store the success it was, Wilbur having the exclusive management of it during the 10 years or so just prior to Rolland's death.

The surviving widow was otherwise left in no need, but, instead, stood to inherit about half of the decedent's interest in the community property, which was about equal with the value of the drug store, and, in addition, would have her own half that would be something in the neighborhood of $100,-000. Added to all of this was the avowed intention of the decedent to leave the drug store to his nephew and his brother, as evidenced, first, in the execution of the typewritten will that he dictated to Wilbur in 1943, and later by the statements of the decedent to some of the witnesses at different times.

On this last phase of the case, the trial judge in his written reasons states that although he believed the several witnesses who testified the decedent had openly acknowledged his intention of leaving this drug store to the members of his own family, Don and Wilbur Fellows, he was under the impression such testimony could have no bearing on the issues because all such statements had reference to the typewritten will only and not to the questioned will. His exact words, as adopted in the majority opinion, are: "The Court does not remember any witness testifying that R. D. Fellows made any statement after the time he destroyed the typewritten will that he would leave the drug store to Wilbur and Don Fellows." Actually, he had a very poor memory and apparently wrote his reasons for judgment without reading the transcript, or he was thinking only of the witnesses

of the plaintiff who clearly showed from their testimony that the decedent told them he had torn the will up (the typewritten will), which is the uniform testimony of the witnesses Don Fellows, Mrs. Loraine Riley and her husband Tom Riley—the latter having witnessed the typewritten will at the time it was executed.

It is difficult for me to understand how the court could have overlooked the testimony of Frank Penniman, a witness for the defendant who, at the time he was testifying, was employed at the drug store under the management of Don Fellows, and who stated that the decedent talked to him several times during the summer of 1948 (the 1943 will was torn up by 1945 according to the plaintiff herself) about the drug store, on which occasions the decedent said "that Don and Wilbur were going to have the drug store." (Page 211 of the transcript.)

The trial judge also failed to remember the testimony of Alfred Mason, the porter and helper in the stock room at the drug store for some 40 years and who was also employed there on the day he testified. Mason stated that a year or so prior to his death the decedent told him "if anything ever happened to him he wanted Mr. Wilbur and Mr. Don to run the drug store," and that he would still work there. He later made this more specific by stating the decedent "said he would leave it to them." (Pages 214 and 215 of the transcript.)

The third witness whose testimony the trial judge overlooked was that of Victor

G. Anderson (one of those attesting to the will at its probate), who had worked in the drug store himself for several years and was at the time he was testifying the marshal of the City Court of Hammond. Mr. Anderson stated he had no interest in the outcome of the case and was friendly to both sides. His testimony is that in June or July of 1948 when he was driving the deceased to Ponchatoula to see someone who was suffering from the same disease as the deceased, Rolland D. Fellows told him he had "left Wilbur, Don and Mrs. Gladys all taken care of," thus clearly indicating he had made a will. (Page 231 of the transcript.)

The last and fourth witness forgotten by the trial judge was Mrs. Wilbur Fellows, with whose testimony I am particularly impressed. She not only frankly admitted there was considerable ill feeling between herself and the plaintiff, Mrs. Gladys Fellows, but also stated that she had tried on a number of occasions after her marriage to Wilbur in 1943 to purchase the drug store from the decedent, but that he had refused to sell it to her at all times for the reason that if he did her son would inherit the store and he "wanted the drug store to belong to Wilbur and Don." It seems to me that if he did not want to sell the drug store to Wilbur's wife because it would get into her family, then he also did not want his wife to have it because her family would inherit it; and the members of the decedent's own family who had contributed the

most to the success of the drug store would not have it.

Other circumstances that seem to have impressed the trial judge and this court were (1) the manner in which the will was confected, particularly the time and place, (2) the condition of the paper upon which it was written, and (3) the failure of the defendant to produce it immediately after his brother's death. In my humble opinion these are not only circumstances that have been very logically explained, but that they are not such as would warrant the conviction of Wilbur Fellows as a forger and a perjurer, particularly when it is remembered that he was, to the knowledge of the trial judge himself (this portion of his written reasons are not incorporated in the majority view), a man of unimpeachable character. In fact, it might be said that this is a no more suspicious circumstance than the idle ceremony the plaintiff asked the court to go through at the time she opened her husband's succession of looking for a will, when she knew at the time, according to her testimony during this trial, that there was no such will, because he had not only told her he had made none, but had also refused to make one even at her request.

On this phase of the case, and to show the significance that should be attached to these circumstances, even if unexplainable, I find most apropos the case of Pena v. City of New Orleans & Baltimore, 13 La.Ann. 86. In that case the plaintiff, Six Years after

the death of John McDonogh, brought forward a purported olographic will bequeathing him $100,000, the will being written on a scrap of paper that did not have the appearance of having been carefully kept (it was creased, discolored, and in parts almost illegible), all of which was thought to be highly significant and suspicious. In finding the will to be genuine and allowing it to stand, the court said: "We would have been better satisfied with some evidence explanatory of the conduct of the plaintiff (here the defendant has amply explained why he kept the will only three days after the succession was opened by the plaintiff), so little in accordance with the usual springs of human action, at least with that most powerful of all, self-interest. We concede the suspicion which may attach to the appearance of this small scrap of paper as the title to a large fortune. But, after all suspicions are not permitted to counterbalance, in the judicial mind, the testimony of numerous and uncontradicted witnesses. It is the recollection of some of us, that a dirty fraction of a half sheet of foolscap, was the vehicle or the devise of a large fortune of the late Chief Justice Martin. A similar eccentricity in John McDonogh, which made, in his case, a bit of paper, barely large enough for a promissory note, the repository of an olographic will, may have communicated itself to the beneficiary of that will, and been the cause of his concealing his existence until six years after the death of the testator."

Also worthy of reference here is the following comment of the court in Succession of Wadsworth, 152 La. 131, 92 So. 760, 762: "It is declared by them to be highly suspicious, because of the time and place and circumstances surrounding the execution of this will. However, we cannot readily detect at all times the psychic cause that induces or impels individual action. The conduct of an individual upon a particular occasion may be unusual or even eccentric; yet it does not necessarily follow that we are justified in repudiating that which was done as incredible because suspicious. Under such circumstances we must apply the rule of reason and search the entire atmosphere of the case, in order to arrive at a just and correct conclusion."

I have searched the entire atmosphere of this case—which instead of being voluminous as stated by the trial judge consists of only 2 volumes of 348 pages in all, 249 of these being testimony and the remainder the pleadings, and of only 41 exhibits, 29 being those of the plaintiff and 12 those of the defendant—and I choose to place importance on the reputation of Wilbur Fellows for honesty rather than on mere suspicion, remembering that his integrity was recognized by the trial judge as being unimpeachable, and it was not otherwise attacked. It is obvious that if this will was forged, Wilbur Fellows forged it. It is conceivable to me, but not probable, that he would, so late in his life, depart from

his normal path of rectitude and become a criminal for such small gain, particularly when he and his wife possessed means and were not in any desperate need of this gain.

I cannot place a brand of "forger" and "perjurer" on this man on mere suspicion. It seems to me that stronger and more convincing evidence should be required, and so I close my dissent by quoting the following particularly pertinent comment of the court in Succession of Wadsworth, 152 La. 131, 92 So. 760, 763: "The presumption of the genuineness of this will arising from the probate proceedings, the testimony of an eye witness to its execution by deceased, the testimony of several other witnesses of proponent as to the genuineness of the signature, the apparent similitude of the signature contested with other signatures of deceased, admitted to be genuine, all corroborated by the naturalness of the bequest itself, present an array of facts which clearly establish to the judicial mind convincing proof of the genuineness of the will herein attacked."

I therefore respectfully dissent.

On Rehearing.

HAWTHORNE, Justice.

After a further study and analysis of the entire record in this case, we have concluded that our original judgment affirming the judgment of the lower court which decreed the will to be null is correct.

The principal cause for the granting of this rehearing was that the district judge's

opinion, which was quoted at length in our majority opinion, contained certain inaccurate statements of fact, but our reconsideration of the case convinces us that they are not of such a material nature that they would cause us to change our original decision.

The deceased in about the year 1943 in a typewritten will made bequests similar to those found in the will here under discussion, but some time between 1943 and 1945 he destroyed this will. The trial judge stated that he did not remember any witness' testifying that R. D. Fellows made any statements after the time he destroyed the typewritten will that he would leave the drug store to Wilbur and Don Fellows. As pointed out in the dissenting opinion, the trial judge overlooked the testimony of certain witnesses who testified that the deceased told them that "Don and Wilbur were going to have the drug store", "that he had left Wilbur, Don and Mrs. Gladys all taken care of", and that he wanted them (Wilbur and Don) to operate the drug store, and also overlooked the testimony of Mrs. Eloise Fellows, wife of Wilbur D. Fellows, to the effect that the deceased told her not to worry, that the drug store would be Wilbur's and Don's. The record makes it fairly certain that most or all of these statements were made by the deceased after the destruction of the typewritten will.

None of these witnesses, however, testified to the existence of the will, and two of them, Penniman and Anderson, testified

positively that the deceased did not mention a will to them. Don Fellows testified that in June of 1948 the deceased told him that he had torn up his will and had told Gladys, his wife, what to do, and no mention was made of any other will. Furthermore, Mrs. Loraine Riley testified that she had been a good friend of the deceased for 10 years, and that he had discussed the question of a will with her many times, and that he told her *subsequently to February 3, 1947, the date of the will here under attack, and just a few months prior to his death, that he had torn up his will, that there was no other will and never would be another one, and that he wanted everything he owned to go to his wife.* We quote from Mrs. Riley's testimony as follows:

"Q. Did he discuss any business matters or personal matters with you? A. Yes.

"Q. Did he ever discuss with you the question of a will? A. Yes.

"Q. About when? A. Many many times he discussed the will with me.

"Q. *Had he discussed that with you since February 3, 1947?* A. *Yes.*

"Q. Can you give us approximately the date of the last time? A. About—between two and three weeks before he went to bed and did not get up again.

"Q. And he stayed in bed for about sixteen weeks? A. Yes.

"Q. Now, what did he tell you about a will? A. He told me that he had torn up the will.

"Q. Did he say what kind of will it was, whether it was typewritten? A. No.

"Q. He just said he had torn up the will that he made? A. Yes.

"Q. Did he say anything about making another? A. *He said he had torn up this will and there was no other will and never would be another one.*

"Q. That was since February 3, 1947 and * * * a few weeks before he went to bed? A. Yes.

"Q. And how long before his death did that happen? A. He was sick between thirteen and sixteen weeks and it was about three weeks before he went to bed and never did get up again.

"Q. What else did he tell you about tearing up that will if anything? What would be done with his property? A. Yes, he said he wanted everything that he owned to go to his wife." (Italics ours.)

The testimony of this witness shows that the deceased himself, by words uttered some 16 or 19 weeks before his death, refuted the possibility of there being in existence a will written by him on February 3, 1947. Actually the only positive evidence of the writing of another will by the deceased after the destruction of the typewritten one is the testimony of Wilbur Fellows. We do not think that the statements of the various witnesses which the trial judge overlooked are positive evidence that the deceased had made a will bequeathing the drug store to Wilbur and Don Fel-

lows, or that they necessarily contradict the testimony of the witness Mrs. Riley, and certainly their statements are not proof that the will produced was one written by the deceased.

The trial judge further erred in the statement that Don Fellows and several lay witnesses testified that the will was not in the handwriting of the deceased, for, as pointed out in the dissenting opinion, the only lay witness besides Don Fellows who so testified was the plaintiff herself, Mrs. Gladys Fellows. Likewise, the only lay witness who testified that the will was in the handwriting of the deceased was the legatee, Wilbur Fellows, who said that it was written in his presence.

As stated before, these errors are not so material as to cause us to change the result reached by us in the original opinion.

We might note, however, that at the probate of the will some four lay witnesses besides defendant Wilbur D. Fellows testified that the will was in the handwriting of the deceased, to the best of their knowledge and belief. Only one of these four was called, and he by the defendant, to testify in the instant case, and neither on direct nor on cross-examination was he questioned about the genuineness of the handwriting in the will.

Wilbur Fellows testified that the will had been in his possession since it was written on February 3, 1947; that he first kept it at the drug store in an envelope

marked "personal" and later took it to his home. Rolland D. Fellows died on Thursday, November 4, 1948, and according to the testimony of Mrs. Eloise Fellows, wife of the legatee Wilbur Fellows, she first knew of the existence of the will on Sunday [November 7, 1948], three days after Rolland D. Fellows' death. One of the attorneys for plaintiff testified that he had a conference with Wilbur Fellows, his wife Eloise, and Don Fellows in the drug store on November 9, 1948 [Tuesday], and at that time and at that place (notwithstanding the fact that according to her own testimony as pointed out hereinabove she knew of the existence of the will) she made the statement that "if there was a will it had been destroyed by Gladys [the decedent's widow]". Both Wilbur and Eloise Fellows never denied that this statement was made, but stated that, if it was made, they did not remember it.

On November 10, 1948, plaintiff herein, decedent's widow, filed a petition to institute a search for a will, and the court appointed a notary public for this purpose. One of the plaintiff's attorneys testified that on this same day or on Friday, November 12, he was informed by one of the attorneys for the defendant that the defendant, Wilbur Fellows, and his wife, Eloise, were worrying the life out of him about the drug store, and that he had informed these people that, unless they could produce a will, they had no case. Defendant's attorney made no effort to deny that

this conversation took place, but attempted to limit its scope by the following question on cross-examination: "Q. Didn't I say that I didn't know if there was a will or not and I told them if they had no will that they did not need a lawyer but if they did have a will to get it probated."

Although both defendant and his wife according to their own testimony knew of the existence of the will, they made no effort to deliver it to the notary appointed by the court to make a search for a will. It was not until Saturday, November 13, that plaintiff's attorney was informed by one of the attorneys representing defendant that defendant had found a will, and he was instructed at that time to deliver it to the notary public. Instead of delivering the will to the notary public appointed to make the search, on November 15 the defendant Wilbur Fellows filed a petition to probate the will, and on the same day it was probated in the office of an attorney in the City of Hammond without notice to plaintiff. The original will was immediately withdrawn from the record, pursuant to an order of court, and a photostatic copy substituted therefor. On November 16 plaintiff herein obtained an order directing Wilbur Fellows to return the original will. Upon his failure to do so, on November 26 an order was issued for him to show cause why he should not be adjudged in contempt of court for his failure to comply with the order to return the will. Between this date and December 3, the time fixed for the hearing on the rule for contempt, the order was complied with and the original will was returned.

From these facts and circumstances, together with those already set out in our original opinion, and our reexamination of the evidence submitted regarding the genuineness of the handwriting in the will, we cannot say that the trial judge committed error in his decision that the plaintiff has shown by a preponderance of the evidence that the will was not written by the deceased.

We have again carefully examined numerous exhibits of the deceased's known signature and handwriting, consisting of checks, bills of sale, minutes of the directors' meetings of the Hammond Building & Loan Association, leases, affidavits, a letter, and other documents, all of these documents having been written or executed by the deceased from a period of a few months prior to the date of the will in question to a few months thereafter. In comparing these documents with the will itself, one can readily see that there are numerous dissimilar characteristics in the handwriting. Defendant's expert admits that such dissimilarities exist, some of these being in the nature of tremors, but explains them by saying that the will was written by a person apparently suffering from some kind of nervous disorder, such as that caused by excessive drinking. Defendant himself says that the deceased had quite a struggle in writing the will, and that it took him 30

minutes to do so. However, in the record we find the testimony of disinterested witnesses that on the night of the date the will was written the deceased was not drinking, nor was he in a nervous condition. Furthermore, there are some obvious dissimilarities which, in our opinion, are not satisfactorily explained by the theory that the deceased might possibly have been suffering from the "shakes the morning after" when he wrote the will.

For the reasons assigned, the original decree of this court affirming the judgment of the district court is reinstated and made the final judgment of this court.

FOURNET, C. J., dissents and assigns written reasons.

PONDER, J., recused.

FOURNET, Chief Justice (dissenting).

After writing a detailed and lengthy dissenting opinion when this case was before us originally, in which I clearly demonstrated that the trial judge's conclusions in this case (upon which the original majority opinion was based) were not only contrary to the jurisprudence of this state, but that the factual premises upon which they were based were not supported by the record, I did not think it would be necessary for me to write another dissenting opinion, particularly since it was conceded by a majority of the court when this rehearing was recommended I had correctly stated the controlling law and that my analysis of the facts was unanswerable. The prevailing view here ignores this law, which is not even mentioned, and admits the trial judge misstated the facts upon which the decision was based. It is thought, however, that these errors "are not of such a material nature that they would cause us to change our original opinion."

At the outset, I wish to point out that although I set forth innumerable specific misstatements of fact in the trial judge's written reasons for judgment, the majority has singled out only two of these instances as examples of their immateriality, i. e., (1) that no one testified R. D. Fellows ever stated he was leaving the drug store to Don and Wilbur Fellows after the typewritten will was destroyed, when the record shows conclusively four witnesses so testified; and (2) that several lay witnesses, including the plaintiff and Don Fellows (who was discredited as a witness by the plaintiff herself), testified the handwriting in this second will was spurious, when the record shows that other than these two not a single witness so testified, while its genuineness was attested in this case by the defendant and also by four other lay witnesses when the will was probated, as evidenced by the testimony taken at that time and made a part of the record in this case.

It is my purpose to show these errors are material, and, in fact, essential to a correct decision in this case under our

recognized rules of law. The disregard of this testimony is apparently intended to balance the scales in favor of the plaintiff by taking from the defendant much of the evidence preponderating in his favor, and, in addition, to relieve the plaintiff of the burden of proving her case by the type and weight of proof required under our law for a successful attack on a will, and more particularly where that will has been duly probated in accordance with law, all as set out in my original dissent.

It is preposterous to say that in overlooking the testimony of the four witnesses who established the decedent's intention to leave this drug store to his brother and nephew, even after he destroyed the typewritten will, the trial judge committed no material error, and the flimsiness of the grounds upon which this testimony is thrown out is astounding.

The testimony of these four witnesses, says the majority in effect, is unimportant and need be given no serious consideration because none of them "testified to the existence of the will," particularly in view of the fact that the plaintiff produced a witness, Mrs. Loraine Riley, who testified decedent told her shortly before his death he had torn up his will and there would never be another. In other words, the decedent's intentions as expressed to four of defendant's witnesses are entitled to no consideration and given no weight, while his intentions as expressed to only one of the plaintiff's witnesses are deemed to be so im-

portant and given so much weight they are decisive of this crucial phase of the case, although it is obvious Mrs. Riley did not establish there was, in fact, no second will.

Actually, the testimony of all five of these witnesses falls into the same category, that is, it is hear-say, being nothing more than a repetition of the decedent's expressed intentions, after the destruction of the typewritten will, with respect to the disposition of his property. Four say, in substance, he wanted his brother and nephew to have the drug store and was leaving it to them. One says, in substance, he wanted his wife to have everything and so was making no will. From sheer weight of numbers, therefore, if for no other reason, it overwhelmingly preponderates in favor of the defendant. At any rate, this testimony must be given consideration as forging just another of the many links in the chain of circumstances that, as pointed out in my original opinion, give unqualified corroboration to the positive testimony of the defendant (whose honesty and integrity were held by the trial judge to be unimpeachable) that the will was not only not in the handwriting of the decedent, but that he was present when it was written and actually saw a portion of it written by his brother.

But there are other reasons which show the majority erred in concluding the trial judge's misstatements with respect to the proof on this point is immaterial.

The most glaring fallacies lie in the assumption that these four witnesses were

offered for the purpose of attesting "to the existence of the will," and to prove it "was one written by the deceased." Since no one, other than the decedent and his brother, knew of this will, it is difficult for me to understand how these witnesses could have been expected to testify to its existence. And inasmuch as there is absolutely nothing in the record to show that three of these four witnesses had any knowledge of the decedent's handwriting, it is ridiculous to presume they were intended to prove the will "was one written by the deceased." In so far as the fourth of these witnesses is concerned, Vic Anderson, this statement is entirely erroneous, for he did testify the will "was one written by the deceased" when the will was probated. His testimony in this respect has never been contradicted, or even challenged by the plaintiff, because when he testified on the trial of the instant case, she did not cross-examine him with respect to the authenticity of this handwriting.

These four witnesses were introduced for one purpose and one purpose only—to establish the decedent's frame of mind with respect to the disposition of the drug store by proving that even after the typewritten will was torn up he still told people he was leaving the drug store to Wilbur and Don Fellows. It is true he did not, in so many words, tell these people he had made a will, but the inference is inescapable that this was the information he intended to convey, for unless he deeded the property to them prior to his death, there was no other way in which Don and Wilbur Fellows "were going to have the drug store," as he told Penniman; that the drug store would "belong to Wilbur and Don," as he told Mrs. Wilbur Fellows; that he "would leave it to them," as Mason stated he said; or that he was leaving "Wilbur, Don, and Mrs. Gladys all taken care of," as he told Anderson.

Additionally, the scant testimony of Mrs. Riley, the plaintiff's star witness, who first denied she had discussed the case with anyone and finally admitted she had gone over it with one of plaintiff's attorneys, is most unimpressive. To say the least, it does not outweigh the testimony of the defendant's four witnesses on this point and is not entitled to the great weight given it in the majority. She testified for the sole purpose of corroborating the plaintiff's statement that the decedent had told her he had made no will, and to corroborate Sofie McChain on another phase of the case, that will be discussed later. Her testimony in both instances is almost word for word the testimony of the other witness. In this instance both she and the plaintiff say their conversation with the decedent about making a will occurred some nineteen weeks before his death and some three weeks before he was bedded with his final illness; that no one else was present (not even the corroborating witness); that he wanted the plaintiff to have everything; and that he hadn't made another will.

The testimony of the defendant's four witnesses, on the other hand, impresses me very much. There is nothing parrot-like about it. Only one of these, the wife of the defendant, was an interested party, while two of the others were not only disinterested but were, in fact, testifying against interest inasmuch as they were, at the time, employed by the plaintiff and working under the supervision of Don Fellows. The fourth, the duly elected marshal of Hammond, Louisiana, and a good friend of the decedent for thirty-one years, had no interest whatsoever in the outcome of this case.

In view of the foregoing, it is obvious the trial judge not only committed a serious error in misstating the facts on this phase of the case, but one that is highly prejudicial to the defendant's cause and, therefore, of a very material nature.

The second error is equally as grievous. This has reference to the trial judge's conclusion that a number of lay witnesses, besides plaintiff and Don Fellows, attested the spuriousness of the handwriting in this will, when the record shows no other lay witnesses so testified. The majority gives no specific reason for concluding this error is unimportant. It is said that although the only lay witnesses testifying with respect to the spuriousness of this handwriting were the plaintiff and Don Fellows, the only lay witness attesting its genuineness was the defendant. It is not pointed out that Don was discredited as a witness by

the plaintiff herself. At this point, therefore, this evidence clearly does not preponderate in favor of the plaintiff, being nothing more than the plaintiff's testimony against the defendant's.

The majority goes on to note that four lay witnesses did attest to the genuineness of this handwriting when the will was probated. Their testimony was made a part of the record in this case. This is at least a tacit admission that the preponderance of the evidence on this point then swings in favor of the defendant.

It is further noted that the only one of these four called on the trial of this case was not questioned about the authenticity of the handwriting in the will, either direct or on cross-examination. In the first place this witness, Vic Anderson, who is referred to above, was not called by the defendant for the purpose of attesting to the genuineness of this handwriting, as above pointed out. In the second place, inasmuch as this witness had already attested the genuineness of the handwriting when the will was probated, it is difficult for me to see in what manner the defendant could have strengthened his case by having him repeat his attestation here, although it is very clear that the plaintiff, by permitting this testimony with respect to the genuineness of the handwriting to go unchallenged, has considerably weakened her case.

It is the plaintiff's burden to prove her case by a preponderance of the evidence; to make her case legally certain, not merely

probable. It is not the defendant's burden to disprove it. Article 1655 of the Revised Civil Code requires that olographic wills be proved by the testimony of two credible persons who are sufficiently familiar with the handwriting of the deceased to recognize it and attest to its authenticity. Under our jurisprudence, a will so probated is prima facie genuine. Clearly, therefore, no successful attack can be launched against a will thus proved unless it is accompanied by testimony of at least equal weight. We do not have the testimony of two lay witnesses establishing the spuriousness of the handwriting in this will. We have only the testimony of the plaintiff, an interested party, and of Don Fellows, not only an interested party, but a discredited witness. To the contrary, we have the testimony of the defendant, also an interested party, and, in addition, the testimony of four other lay witnesses who are totally disinterested. We have also the testimony of only one expert that this handwriting is spurious, while we have the testimony of two experts that it is genuine. By no stretch of the imagination can this evidence be said to preponderate in favor of the plaintiff, or even to be of equal weight.

The fact that the plaintiff failed to produce any lay witnesses from among the friends and business associates of her husband who could attest to the spuriousness of the handwriting in this will raises the presumption, under our well-settled rules of law and jurisprudence, that she did not do so because they would have testified adversely to her contention. Rubenstein v. Files, 146 La. 727, 84 So. 33; Perez v. Meraux, 201 La. 498, 9 So.2d 662; Bates v. Blitz, 205 La. 536, 17 So.2d 816; Succession of Yeates, 213 La. 541, 35 So.2d 210; Olivier's Minor Children v. Olivier, 215 La. 412, 40 So.2d 803; and Arnold v. Sun Oil Co., 218 La. 50, 48 So.2d 369.

It is certainly highly significant that the plaintiff did not even use as witnesses for this purpose those called to attest to her husband's handwriting on the exhibits introduced in evidence, one being the secretary of the building and loan association of which the decedent was for many years the president; and that she did not use Mrs. Riley, the friend who was so close to the decedent for ten years he frequently discussed with her his personal affairs and the matters pertaining to the disposition of his property. At the very least, she should have attempted to contradict the testimony of the four lay witnesses who attested the genuineness of this handwriting when the will was probated, even summoning them as her witnesses for cross-examination purposes, if necessary.

The majority opinion picks up some supposedly suspicious circumstances surrounding the production and probate of this will, and a statement attributed to the wife of the defendant, in an effort to gloss over the plaintiff's failure to prove her case by

the preponderance required by law, and also to bolster the conclusion that the two discussed errors are not of a material nature.

The alleged suspicious circumstances become suspicious no longer under the sequence of events in this case, as set out in my original dissent, and I see little solace that can be eked from the statement attributed to Mrs. Eloise Fellows. The inference, of course, is that she did not know there was a second will at a time when she testified she did. She testified the defendant told her about this will on November 7, 1948. It appears that one of plaintiff's attorneys asked her on the witness stand if she had not stated on November 9, 1948, two days later, that "if there was a will Gladys had torn it up," and that she replied: "I would not doubt that. I don't remember." To my mind this reply is not entitled to the connotation sought to be given it. The way I read this testimony, Mrs. Fellows did not remember having made such a statement, but she did not doubt the plaintiff would tear up any will left in her care.

The final point touched on has to do with alleged dissimilarities between the handwriting in the will and the acknowledged genuine specimens of the decedent's handwriting.

It is admitted by all of the experts, the one testifying on behalf of the plaintiff as well as the two testifying on behalf of the defendant, that such dissimilarities would not make the will a spurious instrument if they could be satisfactorily explained by the decedent's condition at the time he wrote the will, that is, that he was under stress, strain, nervousness, or some other similar inhibition.

To establish that these dissimilarities could be explained by the defendant's condition, it was conclusively proved that for a period of some ten years prior to his death the decedent drank excessively and continuously, and that this condition was such when he wrote this will that he actually labored over it, taking some thirty minutes to write these few lines.

All of this testimony does not mean anything, the majority says, because there is in the record the testimony of "disinterested witnesses" who stated that on the night of February 3, 1947, the night of the day on which the will was written, the decedent was not drinking and was not nervous.

This testimony, dealing with the decedent's condition some ten or twelve hours after he wrote the will, does not prove that his condition at the time the will was written was as described by the defendant. Nor is it sufficient to overcome the testimony in the record establishing the fact that the decedent, during some ten years prior to his death, drank so heavily he drank in "case lots."

Furthermore, this testimony was not given by disinterested witnesses. Mrs. Riley was one of these witnesses, and her testi-

mony has been discussed above. The other witness, Sofie McChain, was the "intimate acquaintance" of the plaintiff and her husband. The testimony of these two people is practically identical. They testified they attended a birthday party on the night of February 3, 1947, at the home of a Mrs. Levy; that the plaintiff and her husband were there; there were also a number of other people there, some of whom they named; that the decedent was not drinking any intoxicating liquor on that night, only coffee; that he was not nervous; and that they played bingo.

Recognizing the great bearing the decedent's condition, brought about by drinking, had on a determination of this case, the plaintiff's attorneys called her back to the stand during the closing minutes of the trial in an attempt to corroborate the testimony of these two friends with respect thereto. She began by stating her husband had not been drinking during the years 1946 and 1947—a fact that was overwhelmingly contradicted by other testimony—yet when she was cross-examined closely, she made it plain she wanted to do nothing but "verify his condition on February 3, 1947," refusing to answer any other questions propounded to her about his condition on other days.

Furthermore, despite the fact this birthday party was attended by a great many other people, among those named by Mrs. Riley, Sofie McChain, and the plaintiff being Mrs. Levy, in whose home the party was given; Mrs. Levy's mother, Mrs. Kahn; Mrs. Levy's sister and brother-in-law; Omar Dameron; Clara Blomire; a Mrs. Patin, and a Mrs. McChain, the only people attending the party called as witnesses by the plaintiff to attest to her husband's condition on the night of the day on which he wrote the will were these two close friends and intimates of herself and the decedent.

If the plaintiff wished to establish that the decedent was not drinking some ten hours after he wrote this will, it was her duty to establish this fact by others attending this party, particularly by disinterested persons, and having failed to do so, the presumption is that their testimony would have been adverse to the plaintiff's contention that the decedent's condition was normal on that night.

Finally, says the majority, there are some other obvious dissimilarities that are not satisfactorily explained under the "shakes" theory. What these are, I cannot say, for they are not pointed out. On this phase of the case, I might say that I think the discrepancies found in the concededly genuine specimens of the decedent's handwriting in the record more eloquently explain these dissimilarities than do the opinions of the experts, and although this was pointed out in my original dissent, these discrepancies are neither discussed nor explained in the majority view.

I cannot join the majority in labeling the defendant, an admittedly honorable and reputable citizen of his community who has

an outstanding reputation for honesty and integrity, a forger and a perjurer on evidence of this weak type, and I must, therefore, respectfully dissent.