<hr />

(91 South. 303)

No. 23960.

### Succession of HAGAN.

(March 13, 1922.)

*(Syllabus by Editorial Staff.)*

1. **Wills** $\Longleftrightarrow$288(3)—In attacking will the burden is on contestant to show insufficiency of evidence on which it was probated.

The effect of probate of a will was to give it a prima facie validity which cast the burden of proof upon those attacking it of showing the insufficiency of the evidence under which it was probated was permissible.

2. **Wills** $\Longleftrightarrow$288(3)—When party attacking has shown insufficiency of evidence to sustain ex parte probate of will, the proponent must prove its genuineness.

Where a will was probated without giving notice of the application for probate to the presumptive heirs, as required by Code Prac. art. 935, who afterward attacked it when they showed the insufficiency of the evidence to sustain the ex parte probate proceedings, the duty to prove the genuineness of the will was on the proponent.

3. **Wills** $\Longleftrightarrow$294—Refusal to admit testimony of mistake of witness testifying at probate of will held error.

In a proceeding attacking the probate of a will, the exclusion of testimony of the only witness in ex parte probate proceedings besides the universal legatee that the witness at the probate proceedings thought that she was testifying to the signature of the deceased to a lease, on the ground that the witness could not contradict her former testimony, was error.

**4. Witnesses ☞414(1)—Exclusion of testimony of deceit practiced on witness in probate proceedings by universal legatee held error.**

In proceedings to attack the probate of a will, in probating which there was only one witness besides the universal legatee, the exclusion of testimony of another witness who while concealed, heard the legatee afterward admit to the witness who testified in the probate proceedings that she had been told by the legatee that she was summoned only to prove a lease by deceased, was error, since it was admissible to corroborate testimony of the witness in the probate proceedings concerning the admission by the legatee, though the witness who overheard the admission could not identify the speaker.

**5. Wills ☞302(1)—Evidence held sufficient to show that an alleged will was not genuine.**

In proceedings to contest a will after being admitted to probate, evidence *held* sufficient to show that the alleged will was not genuine.

**6. Descent and distribution ☞63—Succession; husband held entitled to one-fourth of wife's estate, though attempting to sustain forged will.**

Though a husband attempted to sustain a forged will of his wife in his favor, where he was left in necessitous circumstances by wife, who died comparatively rich, within the meaning of Civ. Code, art. 2382, he was entitled to one-fourth of his wife's estate in pursuance of the statute.

**7. Wills ☞350—Successful contestants of will not entitled to possession until amount of inheritance tax due is determined.**

Where a will has been successfully contested, the successful parties cannot be sent into possession until they have determined contradictorily with the tax collector the amount of inheritance tax due the state.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

In the matter of the succession of Mrs. Letitia Duffy Hagan. Proceedings to contest her will. From judgment for defendant, plaintiffs appeal. Judgment annulled and reversed. Probate proceedings annulled, and will declared forgery. Judgment putting defendant into possession of property and effects of deceased annulled, and injunction against defendant's disposing of property of deceased maintained, and defendant held entitled to one-fourth the property of deceased.

George B. Smart, of New Orleans, for appellants.

J. Arthur Charbonnet and F. F. Teissier, both of New Orleans, for appellee Peter J. Hagan.

By Division C, composed of Justices DAWKINS, ST. PAUL, and THOMPSON.

DAWKINS, J. Mrs. Letitia Duffy was married to Peter J. Hagan March 25, 1913, and they lived as husband and wife in the city of New Orleans until her death July 21, 1918. On July 26th following Hagan presented to the judge who tried this case below a document purporting to be the last will and testament of his wife, written with a pen at the top of a small sheet of note paper, reading as follows:

"New Orleans Feby 11th, 1918.
"I will all I have to my husband.
"Mrs. L. Hagan"

—and asked to have the same probated. There was no prayer for notice to, and none was actually given, the presumptive heirs (brother and sisters of deceased, who resided in New Orleans) as provided by article 935 of the Code of Practice. A printed form of proof was filled out, and signed by the said P. J. Hagan and a Mrs. A. P. Murray, as witnesses to the genuineness of the handwriting of the deceased; and the printed judgment of probate at the foot thereof was signed by the said judge, all on the same day that the application was filed.

August 7, 1918, Hagan was sent into possession on his ex parte application of all of decedent's property, as legatee under the alleged will, without the knowledge of the plaintiffs.

On August 20th following the present plaintiffs, suing as sole heirs of deceased, attacked the said will as—

"illegal, null, and void for the following reasons: That it does not comply with the provisions of law, because it is not entirely written, dated, and signed by the testatrix, Mrs. Letitia Duffy Hagan, and further that the alleged probate proceedings herein are fatally defective, null, and void in that your petitioners were never cited to appear at said probation."

An injunction was granted restraining defendant from disposing of any of the property. Thereafter other proceedings were had, and this suit was finally dismissed on exception of no cause of action by the lower judge June 4, 1919; and on the 6th of that month plaintiffs renewed their demand with another petition attacking the alleged will on the following grounds, to wit:

"That the said pretended will of the deceased, Letitia Duffy Hagan, was not written, dated, and signed by her, but was written and signed by some person unknown to petitioners, and the date written on said document was not written by the same person who wrote the other part of the document; that the probate proceedings are defective, null, and void for the reason that petitioners, although residing in this parish where the will was probated, were not cited to appear at said probation"

—practically the same allegations as those of the former petition. The injunction was renewed, and plaintiffs asked to have the alleged will declared a forgery, and that they be recognized as the lawful heirs of deceased.

Defendant controverted all of the main allegations of plaintiffs, prayed that the will be sustained, and in the alternative that he be held entitled to one-fourth of the estate as surviving husband in necessitous circumstances under the provisions of the Civil Code.

There was judgment for defendant "rejecting the demands of plaintiffs and recalling the injunction herein granted June 6th, 1919," and plaintiffs appeal.

## Opinion.

[1] Had the will in this case been opposed before being probated, the burden would have been upon Hagan to sustain it by proper evidence as to the genuineness of the handwriting. Being unopposed, the requirement of the law was even stronger, for it could not be probated except upon the testimony of at least two credible witnesses that it was entire-written, dated, and signed by the deceased. R. C. C. 1655. One witness would not have been sufficient, however reliable or to whatever extent he might have been corroborated. But, since it was probated, the effect was to give it a prima facie validity, casting the burden of proof upon those attacking it; and, in sustaining this burden, it was permissible to show the insufficiency of the evidence under which it was probated. Succession of Myra Gaines, 38 La. Ann. 123.

[2] The purpose of article 935 of the Code of Practice, it would seem, in requiring that the presumptive heirs be notified of the application for probate, if they reside in the place, is to afford them an opportunity of opposing the alleged will, if they see fit; and the failure to give this notice has the effect of denying them this timely opportunity of making such opposition, and thereby forcing upon the proponent the burden of proof. From this it follows that, in a case of this kind, when the party attacking the will has shown the insufficiency of the evidence to sustain the ex parte probate proceedings, the duty then devolves upon the proponent to prove the genuineness of the will.

[3] The proof offered at the probating of the will in this case consisted of the testimony of the defendant, universal legatee therein, and of said Mrs. A. P. Murray. The latter is shown by the record in this case to have known nothing of the handwriting of the deceased, never having seen her write and sign her name, or otherwise becoming familiar with her writing. She took a lease to deceased to be signed for another party several months before Mrs. Hagan's death, but did not actually see her affix her signature thereto.

The lease was by deceased folded up and taken back by the witness to the lessee without ever looking at it. On the trial below plaintiffs sought to show by this witness that at the time she was called to testify in the probate proceedings she was led to believe that it was to identify the signature of the deceased to this lease; but this was not permitted by the lower judge for the reason that he thought she could not contradict her testimony, as he conceived it, given before him when the will was probated, which ruling was, in our opinion erroneous, although this circumstance might have affected the weight of the witnesses' testimony in the present case. We can easily understand how this witness could have been misled, and the lower court could have gotten the wrong impression of what she intended to say, for we are aware that such proceedings are sometimes more or less perfunctory where they are conducted ex parte, as in this case; and, when the will and the lease were presented to the witness, the latter filled out in her own handwriting, except the signature, she was able to identify it, and, the signatures on the two appearing identical, she easily concluded that they had both been written by the deceased.

[4] The lower court also erroneously excluded the testimony of another witness who was offered to prove that defendant had admitted to Mrs. Murray she had been told by him that she was summoned to prove only the lease. It was shown that this witness had been concealed by Mrs. Murray in her premises for the purpose of hearing the conversation, and, while the proposed witness did not actually see Hagan at the time and was unable later to identify him, yet Mrs. Murray was able to swear that he was the one who did the talking, and the other witness' testimony was admissible to corroborate her. State v. Dudoussat, 47 La. Ann.

978, 17 South. 685; State v. Allen et al., 37 La. Ann. 685.

We would be disposed to remand this case for the purpose of receiving the testimony thus erroneously excluded, but for the fact that we are convinced of the nongenuineness of the alleged will by the proof already in the record.

Defendant had also summoned another witness, Mrs. M. O'Brien, the tenant of his deceased wife, to testify to the handwriting of the will, but she declined to become a witness to that end for want of familiarity with the writing of Mrs. Hagan, and defendant, the purported universal legatee, then substituted himself in her stead, and, together with Mrs. Murray, signed the procés verbal. We feel sure that, if the proof had been developed and the lack of familiarity of Mrs. Murray with the handwriting of deceased had been shown as it now appears in this record the lower judge would not have probated the alleged will.

[5] It is practically undisputed that defendant and his deceased wife did not get along very well; that she had once left him and been compelled to return through fear; that a short time before her death she had said she would not leave him anything, and at every opportunity she was airing her matrimonial difficulties to her relatives and friends. Shortly before her death, when she thought she was about to die, she had one of her sisters take all of her personal effects from her armoire and dresser, in order to keep him from getting them, but subsequently improved and had them replaced, later dying in the hospital. He objected to her seeing her relatives and friends at least to some extent while she was ill; and after his wife's death defendant remarked that he was in the same condition as when his first wife had died, "on his uppers," meaning that he would be without means, which, of course, was inconsistent with the idea that he then knew,

as he now claims, that she had left him her entire property. A few days after Mrs. Hagan died defendant went to Mrs. O'Brien and borrowed the original lease which had been signed by his wife and delivered to the lessee by Mrs. Murray, and never returned it; but on the trial of this case, as well as at the probating of the will, produced a copy of this lease, claiming it to be the same one which he had borrowed from Mrs. O'Brien. He offered no explanation as to why this was done, but it is the contention of plaintiffs that he already had the copy of the lease which had been left with his wife by Mrs. Murray, filled out in the latter's handwriting, and that his wife had neglected to sign it, that his purpose in obtaining the original was to destroy or conceal it, and that he then signed her name to the unsigned copy in the same manner as was done to the will, with the view that the lease might be used to corroborate, by comparison, the genuineness of the will. In any event, no explanation was given as to why the O'Brien lease was borrowed, and the other copy was not accounted for, notwithstanding the lease had not expired by more than two months when he borrowed the copy of Mrs. O'Brien. He had said nothing about having a will until after this lease had been obtained, but a few days subsequent thereto took occasion to inform Mrs. O'Brien that his wife had left one, and went into details, apparently, as to the time and circumstances under which it was made. Another circumstance about the lease is that it is filled out with pen and ink, except that the name of the lessee near the beginning is written in indelible pencil, like the signature, and in a hand seemingly different to that of Mrs. Murray, who wrote and signed it as a witness at her home before taking it to Mrs. Hagan. We think the record discloses with reasonable certainty that this was not done by either Mrs. Hagan, Mrs. Murray, or Mrs. O'Brien; for, although no witness spoke directly on this point, it is shown that Mrs. Murray did her writing with a pen, Mrs. Hagan signed the lease hurriedly with a pencil or pen, and it was kept by Mrs. O'Brien among her private papers without any occasion to refer to it until called for by defendant. There appears to be considerable similarity between the writing of this name and that of the signature to the lease; and if this copy had not been signed, and the name of the lessee was left blank, the natural tendency of one trying to make it appear genuine would be to fill in the name of the lessee where it had been omitted.

The brother and sisters of Mrs. Hagan, although admitting that they had not seen her handwriting often in recent years, testified that they were sufficiently familiar with it to identify the same, which is true in ordinary human experience; and they swear most positively that the will is not written in the handwriting of their sister. True, they, like the defendant, had considerable interest at stake, since one side or the other stood to lose an estate valued at more than $10,000, depending upon the genuineness or nongenuineness of the will. An expert of many years' experience, Prof. L. C. Spencer, whose qualifications we have had occasion to pass upon before, when shown admittedly genuine signatures of Mrs. Hagan, unhesitatingly and positively declared that the latter and the will were not written by the same person. These genuine specimens were brought up with the record, and, after careful examination and comparison with the will, which was also brought up in the original, we, too, are very much impressed that they were not written by the same hand that confected the will. Then, again, the will was apparently written and signed at one time, with the date left blank, which appears to have been written in later with different colored ink, and this within itself is a suspicious circumstance.

As against this evidence of the plaintiff stands alone the testimony of defendant that he saw his wife write the will, just as they were moving from Dauphine street to the house on Constance street, where they were living at the time of her death. He relies, of course, upon the prima facie showing which it is contended the probate proceedings made of the genuineness of the will; but we think that this has been completely overcome by the proof in this record that the only other witness besides the defendant in that proceeding knew absolutely nothing of Mrs. Hagan's handwriting.

We therefore conclude that the alleged will was not genuine.

### The Marital Fourth.

[6] We think that the record leaves no doubt but that the defendant was left in necessitous circumstances, and that his wife died comparatively rich, within the meaning of article 2382 of the Civil Code; and while the effect of our finding in this case is to say that he attempted to sustain a forged will of his wife, in an effort to acquire the whole estate, the law has not made this a bar to his right to recover the marital fourth, and courts cannot legislate, however strong the appeal may be on moral grounds. The record shows that at the time of the trial below defendant had married again, and was earning a salary of $100 per month; but the right existed at the death of Mrs. Hagan, and he has claimed it timely. We cannot see that it has been forfeited by conditions happening subsequently. Succession of Fortier, 3 La. Ann. 104; Dupuy v. Dupuy, 52 La. Ann. 869, 27 South. 287; Succession of Morris, 137 La. 719, 69 South. 151.

[7] The plaintiffs ask, in event of a judgment in their favor, that they be sent into possession of the property and estate of the deceased; but this cannot be done until they have had determined contradictorily with the tax collector the amount of inheritance tax due the state.

For the reasons assigned, the judgment of the lower court is annulled and reversed, and it is now decreed that the probate proceedings be annulled, and the will is declared a forgery; that the judgment sending the defendant into possession of the property and effects of the deceased be annulled and set aside, and that the writs of injunction sued out herein be maintained, reserving to the parties the right, by appropriate proceedings, to be sent into possession of and for a division of the property of the deceased. It is further ordered and decreed that defendant be, and he is hereby, held entitled to one-fourth of the property of the deceased, after the payment of debts, as the marital portion, and that he pay all costs.