JOHNSON, Judge.
This matter was tried in the Civil District Court for the Parish of Orleans on a rule nisi issued on a motion of Mrs. Mary C. Harz to set aside the judgment of said Court probating an olographic will dated February 11, 1957, purported to have been made by decedent, May C. Harte, the motion for the rule alleging that the said will, leaving all decedent’s estate to Mrs. Lillian White Schaefer, is a forgery. Judgment was rendered on April 5, 1960, making the rule absolute, decreeing the will to be a forgery and ordering that the probate proceeding of said testament be annulled and set aside. Defendant, Mrs. Lillian White Schaefer, has appealed from that judgment.
The case presents only an issue of fact confined entirely to the question as to whether the so-called will dated February 11, 1957, was wholly written, dated and signed by decedent. The matter was heard by Judge Louis H. Yarrut of the Civil District Court for the Parish of Orleans. After a careful review of the record, including the testimony, we have concluded that the written reason's given by the trial Judge succinctly and accurately dispose of the issue, and we, therefore, adopt those reasons in full, as follows, to-wit:
“This suit seeks the setting aside and annulment of the probate of an olo-graphic testament on the grounds of:
“(1) Lack of mental testamentary capacity; and (2) forgery of the entire testament.
“The complainant (Mrs. Harz) is the principal legatee and executrix under a prior olographic testament, executed in 1954, and Mrs. Lillian White Schaefer, defendant, sometimes referred to as ‘Mrs. White’ and again as ‘Mrs. Schaefer’, is the sole heir and legatee of the challenged testament, dated February 11, 1957.
“The testament was originally probated ex parte and pro forma upon the testimony of two witnesses, employees of the bank where testatrix kept her account, who testified, without contest, that they recognized the questioned *292 will to be entirely written, dated and signed by testatrix.
“At the outset it is apropos to dispose of the charge that testatrix lacked mental testamentary capacity. The testimony of all witnesses is overwhelming that deceased was fully capable of making a will on February 11, 1957. Complainant’s attorneys now frankly concede this and have abandoned this charge. The issue is now narrowed solely to the question of forgery vel non.
“As is not unusual, there is a conflict of testimony between the handwriting experts, two for plaintiff or complainant testifying emphatically that the testament is a complete forgery, and one expert testifying equally emphatically that the testament is genuine and not a forgery.
“Regarding the testimony of the experts, I am inclined to the logic and reasonableness of the testimony of the two experts who declared the testament to be a forgery. I examined the questioned testament under the microscope and followed the explanation of Mr. Fortier. I was conclusively impressed by samples of the testatrix’ handwriting on three bank checks, admittedly in her handwriting, and found her signature uniform, firm and without the least trace of a tremor, while her signatures uniform, firm and with-decidedly shaky and trembling. That her signatures on the three checks could be firm and without tremor, and the testament signature fully tremulous, can lead only to one conclusion, to-wit:, that the signatures of the checks and the testament were not written by the same hand, hence one is a forgery.
“Significant facts in this connection are these: In all genuine writings, to-wit, letters, former wills and bank checks, the testatrix signed her name or referred to herself as ‘May C. Harte’. However, in the two documents with which defendant was connected, namely, the power-of-attorney testatrix gave defendant in 1952, and in the questioned will, testatrix signed her name and referred to herself in the body as ‘May Celestine Fiarte’. It is not illogical to assume that a forger, familiar with this one deviation, would use it as a red herring and argue that, while unusual, it was done once before, and not illogical to assume that it would be used again. Further, in the two admitted wills, she crossed the ‘t’s’ in testament with one bold unbroken horizontal line, while in the word testament in the questioned will, she crossed each ‘t’ separately.
“However, when experts disagree, we look beyond their opinions to what impresses laymen. In this case, the relationship of the parties, and all relevant facts and happenings prior to the execution of the testament. These are the pertinent admitted facts which throw great light on the issue:
“Testatrix and defendant met and established a close relationship early in 1951. Testatrix was a retired school teacher. Prior to 1951, she lived with her sister (Alice M. Harte), also a retired school teacher, at their home in New Orleans. Alice died in January, 1951, and left considerable property to testatrix, valued at $125,000.00. At the death of Alice testatrix was 70 years of age; at death, 79. None of testatrix’ remaining relatives were willing or able to live with her or to take her into their homes. At this point testatrix found defendant, whom she had known since school days. Defendant was a pupil of testatrix in the grammar grades. Over the years defendant testified she kept in touch with testatrix. January, 1951, defendant offered to stay with testatrix; which offer was accepted. Thereafter, for a period of two-and-one-half years de *293 fendant resided at testatrix’ home in New Orleans.
“At first the relationship between deceased and defendant was cordial. During the two-and-one-half year period from January, 1951, to June, 1953, defendant stayed with testatrix every day from approximately 3 P.M. in the afternoon until 9 A.M. the following morning when she, defendant, returned to her own home on Esplanade Avenue. Testatrix suddenly left her home and went to Mrs. Plarz, and what happened during the two-and-one-half year period in which the testatrix and defendant resided together, that caused testatrix to suddenly leave, is recited in a seven-page letter, dated September 4, 1953, addressed ‘Dear Mimi’ and signed ‘May C. Harte’ (Exhibit P-1).
“It would serve no purpose to recount in detail the contents of that letter except to say that testatrix bitterly assailed defendant, who maltreated and abused her; that defendant called her ‘stingy’, ‘miser’ and cursed and abused her on numerous occasions; that she was so .terrified that she would ‘do anything for peace and to please defendant’, that she even offered to give defendant one-half of her properties and defendant selected the best, but while the titles were examined, testatrix called friends and asked them, one by one, to take her into their homes— all refused except one, in whose home I am now (meaning Mrs. Harz). The offer to give defendant half of her properties is corroborated by defendant, who admitted deceased offered to transfer title to five out of seven houses that she owned, and that she, defendant, went to the office of a Notary Public to accomplish the transfer; and while the papers were being drawn up, testatrix disappeared from her own home; and learned that testatrix had gone to the home of plaintiff, Mrs. Mary C. Harz, wife of Dr. J. G. Harz.
“In 1952, defendant obtained a general power-of-attorney from testatrix. A short time after testatrix fled from her own residence in June, 1953, defendant was notified of the revocation of this power-of-attorney.
“It is apparent that testatrix, after enduring two-and-one-half years of mistreatment, abuse and domination by the defendant, fled her own home in fear and trepidation at what might happen to her at the hands of defendant, and in fear she might be forced to turn most of her properties over to defendant.
“After the testatrix and defendant parted company in June, 1953, defendant did not see testatrix until June 10, 1957. During this 4-year interval there was no communication between defendant and testatrix. On June 10, 1957, defendant testified she learned for the first time, from a Mrs. Taquino, that testatrix was in De Paul Hospital. She and Mrs. Taquino went to De Paul Hospital and were admitted to testatrix’ room, and visited with her for a half hour. Mrs. Taquino was not produced as a witness, but defendant testified that when she entered the room testatrix ‘jumped up’ to greet her, when a Mr. Thomas entered the room and sat on the side of ‘testatrix’ bed. Defendant 'testified that when she and Mrs. Taquino were ready to leave, testatrix put her arm around her, walked with her to the door of the room and reached down and withdrew from under her dress near her bosom a sealed envelope with no inscriptions or writing on it, that testatrix handed her the envelope saying, - ‘When I die, bring this to your lawyer’, but gave no inkling whatsoever as to the contents of the envelope, and defendant made no inquiry.
“Defendant’s story of how she came into possession of the questioned will is incredible. On June 10, 1957, de *294 ceased had not seen defendant for four long years; testatrix had no advance information that defendant would visit her at the hospital, yet testatrix had secreted in her dress this purported olographic will, leaving her entire estate to the defendant, deliberately concealing it from the Hospital authorities, who, as is their custom when receiving a patient, made an inventory of testatrix’ possessions at the time of her admission, which included such inconsequential items as a comb, bar of soap, but no mention of a sealed envelope. De Paul is a mental hospital, and had such an envelope been in possession of testatrix on admission, its contents would have been investigated.
“Dr. Gene Usdin, hospital psychiatrist, testified that during testatrix’ stay at De Paul, testatrix could only get around in a wheel chair. Dr. Usdin testified that testatrix could not take more than a few steps without assistance.
“Mrs. Taquino and Mr. Thomas could have been called by defendant to substantiate her testimony concerning her visit with testatrix, but defendant did not call them.
“After the visit defendant made on June 10, 1957, defendant never saw testatrix again until the time of her death.
“In December, 1957, on his own initiative, Dr. Usdin made a Dictaphone recording of a conversation which he had with the testatrix in her room in De Paul. This Dictaphone recording was made with the knowledge and consent of testatrix. No one else was present at the time the recording was made. Dr. Usdin identified the recording, and it was played in open Court. A written transcript of this recording was made and introduced in evidence as Exhibit P-59.
“There is no doubt that the recording was genuine and authentic and made with the full knowledge and consent of testatrix, and that she was completely oriented mentally, aware of her surroundings and what she was saying. It is equally clear that she left no doubt that she did not make a will in 1957, and had she, defendant would not have been a beneficiary, much less sole and universal legatee.
“It is also significant that, notwithstanding Mr. Chas. I. Denechaud, Jr. was her attorney in the succession of her deceased sister, and also attorney for De Paul Sanitarium, she nevertheless ignored him and entrusted her precious possession, her last will and testament, with the defendant, whom she had violently berated and distrusted, and from whom she had to flee for a haven elsewhere; and further, since defendant had not been mentioned in either of the genuine wills of 1946 and 1954.
“It is also significant that, in the testaments of 1946 and 1954, admittedly genuine, testatrix remembered members of her family and named an executor or administrator, but in the questioned will she did none of these.
“This Court must take judicial notice that on March 10, 1954, defendant went to Sarah Mayo Hospital in New Orleans, accompanied by a close friend and tenant, two relatives of this friend and tenant, and a Notary Public, and obtained from her 84-year old mentally incompetent and dying aunt a nuncupa-tive will, leaving to defendant her entire estate. This will was executed four days before the aunt lapsed into a coma and eight days before her death. Other heirs of the deceased aunt attacked the will made in favor of defendant on the ground the aunt was non compos mentis at the time. The will was annulled. Succession of Mrs. *295 Olympe Lafferanderie, widow of Armand Desmare, 228 La. 871, 84 So.2d 442.
“To maintain the validity of the testament in question, I would have to hold that the testatrix was completely debilitated, both mentally and physically, when the will was written. Mentally debilitated because she bestowed her affection and generosity upon one she despised and fled from in fear, and completely ignored those she had affection for as shown in two prior wills; and physically debilitated because the scribbly, tremulous handwriting evidences palsy or nearly complete paralysis. Both conclusions would be contra to the overwhelming preponderance of the evidence.
“Accordingly, there will be judgment holding the purported last will and testament of deceased in the olographic form is a complete forgery and setting aside its probate as null, void and of no effect.”
As stated by the trial Judge, the will now under attack was probated by the usual ex parte proceedings on the testimony of William T. Gahagan, assistant branch manager of the Whitney National Bank, and Donald W. Perelli, Sr., assistant trust officer of that bank. On the trial of the rule, Mr. Gahagan said of his identification of the purported will that he looked at it hurriedly and it appeared to be her signature, but he did not examine the other writing of the will very closely. Mr. Perelli said he did not compare the signature on the photostatic copy shown him with any other writing; that it appeared to be her signature, and that he did not go over the whole thing, but it appeared to be her handwriting.
This type of testimony cannot lend any weight in substantiation of the validity of the questioned will. The jurisprudence of this state is to the effect that the probate of an olographic will by due attestation according to law gives it a prima facie status of being genuine. Succession of McDonogh, 18 La.Ann. 419 (444); Succession of Hagan, 150 La. 934, 91 So. 303; Succession of Wadsworth, 152 La. 131, 92 So. 760. We believe that the present explanations made by the two witnesses who appeared to probate the will undoubtedly can serve only to detract from or lessen that prima facie result.
In a will contest of this kind, the fact that when the will has been probated, it is the face of the proces verbal of the Judge probating the will without explanation which creates a rebuttable presumption of validity. Certainly, this testimony of the two witnesses who participated in the probate proceedings somewhat qualifies their certification and its limitations must be considered along with any other evidence offered to rebut the presumption.
Counsel for defendant would have us give greater weight to the testimony of his expert witness, Mr. Charles A. Appel, Jr., because he has been called to testify about questioned documents in Courts and for consultation on such subject all over the world. Counsel for plaintiff would discredit his testimony because he apparently spent such little time in preparation of his opinion, after arriving in New Orleans only a day or two before he testified. The main thing that bothers us about Mr. Ap-pel’s testimony, admitting his intelligence and qualifications, is that the discrepancies in the questioned will as compared to decedent’s acknowledged standards of handwriting, as shown by the many exhibits in the forms of checks, letters, etc., are so glaring that we are at complete loss to understand how Mr. Appel could conclude that the questioned will was written by May C. Harte. Early in his discourse he said of the handwriting in the questioned will: “It conforms fully and not only in the general overall pictorial aspects of design, * * * but specifically I studied the very small minute marks of the forms of letters or parts of letters in the questioned *296 will, * * There are so very many obvious discrepancies that it is quite difficult to understand how any person with a fair mind and good eyesight could fail to see and acknowledge them. Mr. Appel was on the witness stand for one hundred twenty pages. We shall not attempt to itemize the literally hundreds of points, such as shape of letters, pen rests, pressures, lifts, punctuation and spacing, about which he was questioned, nor to discuss wherein we think he was in error. On direct examination he had what might be termed a “field day.” He elaborated at length in erudite, scholarly language the conscious and unconscious characteristics of decedent and why the writing in question conformed to them, as well as to show the habits of a forger and why this writing could not have been done by a forger. But on cross-examination his answers took on a somewhat different trend and he admitted many of the differences. In some instances he would endeavor to explain and in some he would not.
As to what effect a person’s mental condition might have upon that person’s handwriting, Mr. Fortier, a handwriting expert of high repute, stated that it depended a great deal on each individual, and he did not endeavor to place decedent in a pattern of personality nor permit any unproven but assumed pattern of personality to influence his opinion in the appraisal of the subject before him. He examined numerous agreed specimens of decedent’s known writing and very simply and easily made the comparisons. We think that approach is the more reliable. None of the experts had a personal acquaintance with decedent. It would seem to be more reliable to work from a known premise of what she did and the way she did it, rather than to try to explain why she did this or that on the assumption that she possessed characteristics that would indicate that she should or should not have done it that way. It is Mr. Fortier’s positive opinion that decedent did not write the will dated February 11, 1957. Plaintiff’s expert, George J. Lacy, of Houston, Texas, recited qualifications which appear equally impressive as those of Mr. Ap-pel. He expressed his conclusion in this manner: “Well it is my very definite opinion that the person who wrote the acknowledged genuine writings of May C. Harte did not write the olographic will signed May Celestine Harte dated February 11, 1957.”
The defendant, Mrs. White, presented the will for probate and in her answer to the rule herein she maintains that the will of February 11, 1957, is the genuine will of decedent. While the testimony of this defendant as to the manner in which she came into possession of said will had no direct bearing upon the validity of the will, it has a direct bearing upon her testimony attempting to link decedent with that will, which is a necessary element of validity. After said defendant had lived with decedent in decedent’s home, had cared for decedent for a couple of years or more, decedent secretly absconded, in June, 1953, from her own home through fear of receiving bodily, mental and financial harm to herself at the hands of defendant, after which defendant had no occasion to see decedent, at any time or place, exhibited no interest in her whatever, but then suddenly, unannounced, on June 10, 1957, four years later, defendant says she paid decedent a visit in the hospital, taking with her Mrs. Taquino and Mr. Thomas. When the visitors were walking from the room to depart, decedent reached in the bosom of her dress and pulled out an envelope, handed it to defendant with the instruction that at decedent’s death to take it to her lawyer, which she says she did. She said this envelope contained the will now in question. The defendant never saw decedent again. The trial Judge refers to this testimony and the circumstances surrounding the delivery of the will to defendant as being “incredible.” We go further than that and say that this story is so fantastic as to be ludicrous. She did not produce as witnesses the two people who are said to have accompanied her to the hospital and, *297 therefore, her statement stands uncorroborated in any part, not even by any semblance of plausibility. Disregarding Mrs. White’s testimony, as we do, there is no evidence whatever to connect the purported will with decedent. The argument as to handwriting, of course, is made, but it would appear that any similarity of handwriting is secondary without some credible evidence that decedent had the will in her possession at some time, or that it was found where she reasonably could have been expected to put it. The complete absence of any believable evidence in explanation as to how this defendant came into possession of this document is substantial corroboration of the testimony of Mr. For-tier and Mr. Lacy, experts, that the handwriting is a forgery. Succession of Drysdale, 127 La. 890, 54 So. 138.
Counsel for defendant argues that the tape recording of Dr. Usdin’s conversation with decedent in the hospital is not admissible as being hearsay evidence. Timely objection was made when the tape was offered in evidence and reproduced by the machine in open Court. The Court properly overruled the objection. While it is true the Courts have said many times that the statements of a deceased person constitute the weakest kind of evidence, the Courts at the same time admit the statements when presented in proper circumstances and with proper foundation, unless there are other legal reasons to reject them. In a number of decisions we have read in connection with our study of this case, and particularly Fellows v. Fellows, 220 La. 407, 56 So.2d 733, statements purported to have been made by a testator in those cases are not only admitted in evidence but the Courts have discussed the statements of a decedent freely. Here there are not only the recorded statements of decedent, those statements are substantiated by decedent’s own voice, which is recognized and identified by witnesses. The import of Dr. Usdin’s testimony and of the statements made by her reproduced by a recording machine is that she was entirely satisfied with the will which she made in 1954 and did not want to change it.
All in all, there is a great preponderance of evidence that the questioned document is an outright forgery, and the judgment appealed from is affirmed, with costs to be paid by defendant, Mrs. White.